**James Don BARTELL, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–90–0060.**

Court of Criminal Appeals of Oklahoma.

Sept. 2, 1994.

Rehearing Denied Oct. 11, 1994.

**94**

Steve Hess and Jack Wilkins, Oklahoma City, for appellant.

Wes Lane, Asst. Dist. Atty., Oklahoma City, for State.

Benjamin McCullar, Asst. Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., Steve Kerr, Asst. Atty. Gen., Oklahoma City, for State on appeal.

*OPINION*

LUMPKIN, Presiding Judge:

Appellant James Don Bartell, was tried by a jury in the District Court of Oklahoma County, Case No. CRF–88–6937, and convicted of one count of Forcible Oral Sodomy (21 O.S.Supp.1982, § 888). The jury recommended he be sentenced to thirteen (13) years imprisonment, and the trial court sentenced accordingly. We publish to reaffirm the principles dealing with constitutional errors and the possibility of those errors being harmless in the wake of *Simpson v. State,* 876 P.2d 690 (Okl.Cr.1994).

I.

The victim, S.B., was three years old at the time the crime was committed. However, the act did not come to light until nearly a year later, in July 1988, when S.B. was talking to her grandmother. The grandmother, Ruth Wilkerson, testified S.B. expressed concern about going to the Bartell house with her mother. Wilkerson thought this strange, as S.B. in the past had seemingly enjoyed visiting the Bartells and playing with their young daughter, Saphronia. When asked why she did not want to go, S.B. replied she did not like James, the Appellant. In response to further questioning, S.B. said James had made her do something very bad for a long, long time. S.B. did not elaborate, as her mother, Glenda Bower, happened to return at that time. The next weekend, Wilkerson renewed the conversation when the child was again at her grandparents. S.B. made Wilkerson promise not to tell Glenda because she would be angry, and James had made S.B. promise not to tell. Again, S.B. did not elaborate. Fearing the worst, Wilkerson told Glenda.

Glenda questioned S.B. that evening by playing a game in which the parties would list who they loved. S.B. told her mother she loved Debbie, Appellant's wife; but she did not love James "because of what he made me do," adding the act was bad and she had to do it for a long time. S.B. then told her mother "he made me suck his weenie." When Glenda asked her what she meant by that, S.B. got a collector's doll which had a small penis, and placed her mouth over the penis. Then S.B. put her finger in her mouth and acted as if she were sucking on it. She said James was holding the penis in his hand and moving it while it was in her mouth. This act continued for a long time, S.B. said. When she complained she had to go to the bathroom, James told her to urinate on the floor. S.B. continued sucking until a point when "juice" came out of the "hole" on James' "weenie." S.B. told her mother she had not told earlier because James had told her not to, and she feared Glenda would be angry with her. The act occurred the summer before, when it was hot out. S.B. knew only one "James," and that was Appellant. Glenda then contacted police.

Police Detective Bonnie Walker began her interview with S.B. by asking her general, non-threatening questions. She then had S.B. identify parts of anatomically correct dolls. When she pointed to the penis on the male doll, S.B. identified it as a "weenie," spontaneously adding "But James do [or did] that to me." In response to more questions by Walker, S.B. stated James made her "suck his weenie." She continued the act

until a "yellow juice" came out and went in her mouth, adding she didn't like it. Testimony was introduced to the effect the child did not have a firm grasp of colors at the time she made the statement. S.B. said James did not take off her clothes, but did pull his pants down during the act. The child also repeated the incident where James told her to urinate on the floor if she needed to, refusing to let her stop to go to the bathroom. Walker related the conversation with S.B. at trial. The interview was also taped and played for the jury.

S.B. repeated the story for a pediatric resident at Children's Hospital, where she was taken for an examination. In addition, S.B. testified and related the events during trial.

Evidence was introduced showing S.B.'s attitude towards Appellant had changed from one of friendship to fear. The change in attitude occurred sometime during the end of the summer of 1987.

Appellant introduced evidence showing he did not commit the acts. A psychologist who tested Appellant testified Appellant did not exhibit any sexual abnormalities. Appellant also introduced evidence pointing to a former husband of Glenda as a possible culprit. Appellant did not question that S.B. may have been forced to commit the sodomy; however, he denied he had committed the act.

## II.

For his first proposition of error, Appellant alleges he was denied his Sixth Amendment right of confrontation when the videotaped interview between Walker and S.B. was played for the jury. The record does not reflect it, but it seems clear the tape was played pursuant to 22 O.S.Supp.1986, § 752. That provision was declared unconstitutional by this Court in *Burke v. State*, 820 P.2d

1344 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2940, 119 L.Ed.2d 565 (1992).[1]

The State acknowledges the statute in question was declared unconstitutional; however, it responds the court's use of the statute is subject to a harmless error analysis. The State argues the error was harmless, since the same matters were presented by S.B. herself, as well as the examining doctor and family members.

■ Recently, this Court in *Simpson v. State*, 876 P.2d 690 (Okl.Cr.1994), revisited its methodology of reviewing errors committed during trial. We wish to take this opportunity to examine our methodology of reviewing errors when those errors are of a constitutional magnitude. We reaffirm our basic holding: that once an error of constitutional dimensions is presented, the burden falls upon the State to prove it is harmless beyond a reasonable doubt.[2]

### A.

A discussion of the harmless error doctrine as it relates to non-constitutional errors is discussed thoroughly in *Simpson*. *Id.* at 697–701. *Simpson* notes that when it came to constitutional errors, however, courts until relatively recently assumed a constitutional error always necessitated reversal. The first hint to the contrary appeared in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). That case dealt with a Fourth Amendment violation which the Connecticut court acknowledged but held it harmless error. In reversing the Court observed:

> On the facts of this case, it is not now necessary for us to decide whether the erroneous admission of evidence obtained by an illegal search and seizure can ever be subject to the normal rules of 'harmless error' under the federal standard of what constitutes harmless error.

1. The statute in question was repealed by the Legislature in 1993. *See* Laws 1993, c. 197, § 4. Such a repeal renders our interpretation of the statute moot, and we therefore see no need to reconsider it. However, the Court did not consider a harmless error analysis in *Burke*. We now address the application of harmless error analysis to constitutional errors.

2. In Appellant Bartell's case, trial counsel objected to the tape's being played before the jury. We therefore are not presented with a situation where counsel failed to object, and whether that failure to object affects our analysis.

*Id.* 375 U.S. at 86, 84 S.Ct. at 230. However, the issue was framed by Justice Harlan in his dissent, where, after reviewing the opinion and its discussion of the evidence below, he stated:

This brings me to the question which the Court does not reach: Was it constitutionally permissible for Connecticut to apply its harmless-error rule to save this conviction from the otherwise vitiating effect of the admission of the unconstitutionally seized evidence? I see no reason why not. It is obvious that there is no necessary connection between the fact that evidence was unconstitutionally seized and the degree of harm caused by its admission. The question of harmless error turns not on the reasons for inadmissibility but on the effect of the evidence in the context of a particular case. Erroneously admitted 'constitutional' evidence may often be more prejudicial than erroneously admitted 'unconstitutional' evidence. Since the harmless-error rule plainly affords no shield under which prosecutors might use damaging evidence, unconstitutionally obtained, to secure a conviction, there is no danger that application of the rule will undermine the prophylactic function of the rule of inadmissibility.

*Id.,* 375 U.S. at 94, 84 S.Ct. at 234.

Four years later the Court resolved the question framed by Justice Harlan. The issue in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) centered around an acknowledged Fifth Amendment violation: commenting on a defendant's failure to testify at trial. The defendant contended no constitutional error could be harmless. The Court disagreed, noting that all 50 states, as well as Congress, had established harmless-error statutes or rules; noting that no rule on its face distinguished between federal constitutional errors and errors of state law or federal statutes and rules. As a result, the Court determined even though automatic reversal had been applied in the past, that in itself did not mean constitutional errors could never be treated as harmless. *Id.,* 386 at 22, 87 S.Ct. at 827.

In deciding what standard should be used in applying the harmless error analysis to constitutional errors, the *Chapman* Court first recognized "harmless-error rules can work very unfair and mischievous results" giving as examples "when highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one." *Id.* at 22, 87 S.Ct. at 827. The Court stated the purpose of the harmless-error rule, noting all such rules have as their aim a rule that "will save the good in harmless-error practices while avoiding the bad, so far as possible." *Id.* at 23, 87 S.Ct. at 827–28. The Court then looked to its earlier opinion in *Fahy,* stating:

The federal rule emphasizes 'substantial rights' as do most others. The California constitutional rule emphasizes 'a miscarriage of justice,' but the California courts have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' *Id.,* at 86, 84 S.Ct. at 230. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,[3] this statement in Fahy itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot,

---

**3.** [*Footnote Number 8 by the Court*] *See, e.g., Payne v. State of Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (coerced confession); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel); *Tumey v. State of Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (impartial judge).

under *Fahy*, be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. State of Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Id.* 386 U.S. at 23–24, 87 S.Ct. at 827–28 (some footnotes omitted). It is this standard by which this Court is bound. *Id.* at 21, 87 S.Ct. at 826–27.[4]

■ The above quotation from *Chapman* provides the precept some constitutional errors can be considered harmless, and some cannot. If the error is subject to the harmless-error analysis, the harmless-beyond-a-reasonable-doubt standard applies. However, before it can reach that point, a reviewing court must first determine whether the alleged error can be harmless at all.

### B.

The *Chapman* Court observed past cases "indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." It cited three as examples: *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (dealing with a coerced confession)[5]; *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (dealing with right to counsel); and *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (dealing with an impartial judge). *Chapman*, 386 U.S. at 23 and n. 8, 87 S.Ct. at 828 and n. 8.

Beyond these three explicit examples, the *Chapman* opinion provided little guidance. However, the Supreme Court more recently has set forth a standard to determine when a harmless-error analysis is appropriate.

In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court was faced with a case involving a coerced confession. Fulminante, believing his life was in danger while in prison, confided to another inmate who was a police agent solely because the agent said he would not

---

4. As the Court said:

> Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights.

*Chapman*, 386 U.S. at 21, 87 S.Ct. at 826–27. *See also Id.* at 46, 87 S.Ct. at 839 (Harlan, J., dissenting) ("My understanding of our federal system, and my view of the rationale and function of harmless-error rules and their status under the Fourteenth Amendment, lead me to a very different conclusion. I would hold that a state appellate court's reasonable application of a constitutionally proper state harmless-error rule to sustain a state conviction constitutes an independent and adequate state ground of judgment.")

As this is a direct appeal case, this Court need not determine whether the *Chapman* harmless-error standard applies on post-conviction appeals. *See Brecht v. Abrahamson*, — U.S. —, — – —, 113 S.Ct. 1710, 1713–14, 123 L.Ed.2d 353 (1993) (In deciding whether the *Chapman* harmless-error standard applies to the prosecution's use for impeachment purposes of petitioner's post-*Miranda* silence on habeas relief, Court "hold[s] that it does not. Instead, the standard for determining whether habeas relief must be granted is whether the Doyle error 'had substantial and injurious effect or influence in determining the jury's verdict.' (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

5. *But see* discussion in *Arizona v. Fulminante*, below.

protect Fulminante unless he told the complete truth. Faced with this proposition, Fulminante confessed to murdering and sexually assaulting his stepdaughter, leaving her body in the desert. Fulminante was convicted based on this confession. The majority of the Court held the confession was not harmless; however, the value of the opinion for this discussion lies in the portion dealing with whether harmless error could be used at all in analyzing the appeal. The majority of the Court, speaking through Chief Justice Rehnquist, analyzed the cases where a harmless-error analysis had been used,[6] then concluded:

> The common thread connecting these cases is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. In applying harmless-error analysis to these many different constitutional violations, the Court has been faithful to the belief that the harmless-error doctrine is essential to preserve the "principle that the

central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

*Id.* 499 U.S. at 307–08, 111 S.Ct. at 1264 (quoting *Delaware v. Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436 (citations omitted)).

The Court differentiated the "trial errors" from what it deemed "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." It pointed to *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (involving the total deprivation of the right to counsel at trial); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (involving a judge who was not impartial), as examples, observing "[t]he entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Id.* 499 U.S. at 309–10, 111 S.Ct. at 1265.

---

6. *See, e.g., Clemons v. Mississippi,* 494 U.S. 738, 752–53, 110 S.Ct. 1441, 1450–51, 108 L.Ed.2d 725 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Carella v. California,* 491 U.S. 263, 266–67, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (jury instruction containing an erroneous conclusive presumption); *Pope v. Illinois,* 481 U.S. 497, 501–504, 107 S.Ct. 1918, 1921–1923, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an erroneous rebuttable presumption); *Crane v. Kentucky,* 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (restriction on a defendant's right to cross examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Rushen v. Spain,* 464 U.S. 114, 117–118, and n. 2, 104 S.Ct. 453, 454–455, and n. 2, 78 L.Ed.2d 267 (1983) (denial of a defendant's right to be present at trial); *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser-included offense in a capital case in violation of the Due Process Clause); *Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (failure to instruct the jury on the presumption of innocence); *Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); *Brown v. United States,* 411 U.S. 223, 231–232, 93 S.Ct. 1565, 1570–1571, 36 L.Ed.2d 208 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (confession obtained in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)); *Chambers v. Maroney,* 399 U.S. 42, 52–53, 90 S.Ct. 1975, 1981–1982, 26 L.Ed.2d 419 (1970) (admission of evidence obtained in violation of the Fourth Amendment); *Coleman v. Alabama,* 399 U.S. 1, 10–11, 90 S.Ct. 1999, 2003–2004, 26 L.Ed.2d 387 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause).

The Court noted the addition of other cases to the original *Chapman* list [7] before stating:

> Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."

*Id.* at 310, 111 S.Ct. at 1265 (quoting *Rose v. Clark,* 478 U.S. at 577–578, 106 S.Ct. at 3106 (citation omitted). *See also Brecht v. Abrahamson,* 507 U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353, 367 (1993) (habeas corpus case reaffirming *Fulminante* harmless-error analysis on trial-error-versus-structural-defect basis).

This discussion is intended neither to be exhaustive nor all-inclusive. It merely shows the principled methodology this Court utilizes in its analysis of constitutional issues before it.

Having determined the scope of constitutional harmless error and when it can be applied, we turn to the issue *sub judice.*

### C.

This is clearly an error in the trial process itself. Without the videotape, this Court can "quantitatively assess[ ]" the "context of other evidence presented in order to determine whether [admission of the video tape] was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307–08, 111 S.Ct. at 1264. This view is supported by *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), in which the Court, although reversing, left room for harmless error analysis:

> We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e.g., Delaware v. Van Arsdall,* 475 U.S., at 679, 684 [106 S.Ct. at 1435, 1437–38], and

see no reason why denial of face-to-face confrontation should not be treated the same. An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence. The Iowa Supreme Court had no occasion to address the harmlessness issue, since it found no constitutional violation. In the circumstances of this case, rather than decide whether the error was harmless beyond a reasonable doubt, we leave the issue for the court below.

*Id.* 487 U.S. at 1021–22, 108 S.Ct. at 2803. Using this guideline as we previously applied it in *Shipman v. State,* 816 P.2d 571, 575 (Okl.Cr.1991), we can therefore easily examine the remaining evidence in this case to determine whether use of the videotape was harmless beyond a reasonable doubt.

■ The Appellant was not deprived of his ability to confront and cross-examine the victim at trial. Therefore, his right of confrontation at trial was not denied and the allegation of error seeks to address only the lack of confrontation and cross-examination at the time the video tape was made. In addition to S.B.'s testimony, there was testimony properly admitted under 12 O.S.Supp.1986, § 2803.1 from the child's grandmother, her mother and her doctor, all of which mirrored the child's testimony at trial. In addition, both the grandmother and the mother testified S.B.'s attitude toward Appellant changed from one of affection to one of fear toward the end of the summer of 1987, about the time the act took place. That testimony showed the child no longer wanted to visit the Bartell household, and became nearly hysterical if forced to do so. Additionally, a records custodian from Appellant's place of work testified Appellant was off work during

7. *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of members of the defendant's race from a grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 177–178, n. 8, 104 S.Ct. 944, 950–51 n. 8, 79 L.Ed.2d 122 (1984) (the right to self-representation at trial); and *Waller v. Georgia,* 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984) (the right to public trial).

the time the act took place. Even Appellant and his wife admitted something had happened to the child; that she was not as affectionate toward Appellant as she had been. Both Appellant and his wife believed the child had been sexually abused; they simply denied Appellant was the culprit.

In light of this overwhelming evidence, we hold the admission of the videotape, though unconstitutional, was harmless beyond a reasonable doubt.

## III.

For his second assignment of error, Appellant contends the court erred in allowing the jury to hear testimony and see demonstrations involving anatomically correct dolls. S.B. used the dolls to demonstrate to the pediatric resident and again at trial what had occurred to her. In both instances, the use of the dolls followed S.B.'s verbal recollection of the incident.[8]

On appeal, Appellant claims the court erred because use of the dolls did not meet the scientific reliability standard enunciated in *Frye v. United States*, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). This is the standard this Court has traditionally used in dealing with scientific evidence. *See Yell v. State*, 856 P.2d 996, 996 (Okl.Cr.1993); *Moore v. State*, 788 P.2d 387, 398 (Okl.Cr. 1990); *Plunkett v. State*, 719 P.2d 834, 840 (Okl.Cr.1986); *Driskell v. State*, 659 P.2d 343, 356 (Okl.Cr.1983).

■ We note the existence of the relatively recent pronouncement by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) that the introduction of the Evidence Code has effectively overruled *Frye*. The circumstances of this case preclude us from re-examining our use of the *Frye* test as it pertains to our own Evidence Code. First, we note the absence of objections, waiving the proposition on appeal for all but plain, reversible error. 12 O.S.1991, § 2104(A);

*Simpson*, 876 P.2d at 701. Second, we find the use of anatomically correct dolls in this situation cannot be categorized as scientific evidence.

The doctor, Denise Scott Campbell, interviewed S.B. after taking a history from a social worker. She related the only confusion S.B. had about the incident was its frequency: she indicated it may have happened more than once. S.B. then told her what occurred. She then demonstrated the acts, using the dolls. Likewise at trial, S.B. used the dolls to demonstrate the act only after relating to the jury what had occurred.

■ We find it difficult to believe a preschool-age child such as S.B. could make effective use of scientific evidence. Rather, the dolls here were demonstrative evidence, in that they were "not ... involved in the litigable event, but [were] offered for illustrative purposes only to make other evidence more comprehensible for the trier of fact." 2 L. Whinery, *Oklahoma Evidence: Commentary on the Law of Evidence* at 424. So long as the demonstrative evidence "possess[es] the degree of representational accuracy necessary to fulfill their illustrative purposes in the courtroom," it need not meet some of the stricter standards of admissibility as so-called "real" evidence. *Id.* This Court has held the admissibility of demonstrative evidence is within the discretion of the trial court, whose discretion will not be disturbed absent an abuse of that discretion. *See Nguyen v. State*, 769 P.2d 167, 171 (Okl.Cr.1988) (admitting into evidence a shirt the appellant had left at a nearby apartment on the night of the murders not error.); *Owens v. State*, 747 P.2d 959, 960–61 (Okl.Cr.1987) (admitting a pellet pistol that victim testified looked like the gun appellant "showed" her before he raped her not error); *Coggin v. State*, 745 P.2d 1182, 1185 (Okl.Cr.1987) (holding refusal of court to admit an educational video tape on the effects of Post Traumatic Stress Disorder because its probative value outweighed the prejudicial effect for the appellant not error; repeating the admissibility of demons-

---

8. Appellant did not raise it, but the record also shows S.B. demonstrated the sexual act to her mother by using a collector's doll the mother kept at the house. The mother testified the par-

ticular doll S.B. chose was "a collector's item and it just happens to have kind of a little penis on it." The mother said S.B. demonstrated the act by taking this doll and "put it in her mouth."

trative evidence is a question of legal relevance that is within the discretion of the trial court).

Other jurisdictions faced with the question of anatomically correct dolls have reached the conclusion the requirements of *Frye* need not be applied to techniques involving anatomically correct dolls. In *State v. Oslund,* 469 N.W.2d 489 (Minn.App.1991), a court deemed the dolls were not scientific tests, but "primarily illustrative tools," adding an interpretation by an expert is "a small aspect of the expert testimony derived from these techniques." *Id.* at 494–95. In *Matter of Rinesmith,* 144 Mich.App. 475, 376 N.W.2d 139, 141–42 (1985), an appeals court held the use of the dolls does not rise to the level of a scientific test subject to the *Frye* rule, observing "[t]he dolls are not calculated to elicit a particular result but as a tool to permit children to communicate ideas which they are unable to express" because of age or lack of vocabulary. *See also Commonwealth v. Trenholm,* 14 Mass.App. 1038, 442 N.E.2d 745 (1982); *People v. Garrison,* 166 Mich. App. 557, 420 N.W.2d 851, 852 (1988), *vacated on other grounds,* 436 Mich. 866, 460 N.W.2d 226 (1990); *State v. Jenkins,* 326 N.W.2d 67 (N.Dak.1982); *State v. Lee,* 9 Ohio App.3d 282, 459 N.E.2d 910 (1983), all approving use of anatomically correct dolls.

Therefore, since the evidence is not a scientific test in the sense it requires a certain scientific reliability, the *Frye* test—or any other test establishing reliability or trustworthiness, *see Daubert,* 509 U.S. at —— n. 9, 113 S.Ct. at 2795 n. 9, 125 L.Ed.2d at 481 n. 9—need not apply. And since the evidence here also possessed the degree of representational accuracy necessary to fulfill its illustrative purpose in the courtroom, it was relevant and its admission was not error.

Therefore, we see no plain error necessitating reversal. This proposition is without merit.

### IV.

■ The remainder of Appellant's contentions do not necessitate extended discussion. For his third proposition of error, Appellant contends there was insufficient evidence to support his conviction. We reviewed that evidence above in connection with our harmless-error analysis. We need not repeat it here. In the light most favorable to the prosecution, there is sufficient evidence to allow any rational trier of fact to find the elements of the crime beyond a reasonable doubt. *Spuehler v. State,* 709 P.2d 202, 203–04 (Okl.Cr.1985).

### V.

■ Appellant next contends his sentence was excessive. He was sentenced to 13 years imprisonment. The maximum punishment allowed by law was 20 years. This Court has repeatedly stated it will not disturb a sentence unless it is so excessive that it shocks the conscience of the Court. *Bristol v. State,* 764 P.2d 887, 891 (Okl.Cr.1988); *Casady v. State,* 721 P.2d 1342, 1346 (Okl.Cr. 1986); *Moore v. State,* 501 P.2d 529, 533 (Okl.Cr.1972). There is nothing shocking about this sentence. Appellant forced a three-year-old girl to sodomize him, effecting a profound change in the child's outlook towards him. This final proposition is without merit.

Accordingly, Appellant's conviction is AFFIRMED.

LANE, Judge, specially concurring:

I do not disagree with the majority when it subjects the error in admitting the tape to a harmless error analysis. However, I do not think it necessary.

In my dissent to *Burke v. State,* 820 P.2d 1344 (Okl.Cr.1991) I expressed my view that 22 O.S.Supp.1986, § 752 did not violate the Confrontation Clause of either the state or federal constitutions, and that subject to the limitations of the evidence code, the videotaped statement of a child victim may be admissible. I find nothing in the tape or its use that would make it inadmissible under the evidence code, and therefore I vote to affirm the conviction without using the "harmless error" analysis.

JOHNSON, Vice Presiding Judge, dissenting:

I agree in the dissent of Judge Chapel herein, but in so doing I need to clarify my

position as to the dissent. I also agree with Judge Chapel that a harmless error analysis may be applied to the videotape that was admitted pursuant to 22 O.S. § 752. I was the author of the opinion as it relates to such statute. *Burke v. State*, 820 P.2d 1344 (Okl. Cr.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2940, 119 L.Ed.2d 565 (1992).

When the harmless error analysis is attached to this case, one cannot say beyond a reasonable doubt that the evidence of the video tape, since there was little other evidence, did not lead to the finding of the jury and contribute to their verdict.

CHAPEL, Judge, dissenting:

In Proposition I Bartell claims that his conviction must be reversed because the trial court admitted a videotape of the child-victim's out-of-court statements. The videotape was admitted pursuant to 22 O.S.Supp.1986, § 752, which was declared unconstitutional in *Burke v. State*, 820 P.2d 1344 (Okl.Cr.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2940, 119 L.Ed.2d 565 (1992). I agree with the majority that admission of this videotape constitutes plain error, but because I disagree with the finding that the error was harmless, I dissent.

I welcome the majority's extensive explanation of the standard of review for constitutional error which was recently discussed in *Simpson v. State*, 876 P.2d 690 (Okl.Cr. 1994).[1] As the majority's detailed analysis of relevant Supreme Court cases makes clear, violations of the Confrontation Clause amounting to trial error (as opposed to structural defects that rob the trial of its validity) may be subject to harmless-error analysis. This Court may thus conduct a harmless-error analysis in cases where a videotape has been improperly admitted under § 752 and *Burke.* In every such case the State must be able to prove beyond a reasonable doubt that the error complained of did not contribute to the conviction. It is in the application of this

analysis that I part from the majority opinion.

While the majority does not explicitly so state, it is clear that the unconstitutional admission of the videotape here was plain error. The majority notes that Bartell had the opportunity to confront and cross-examine the child-victim at trial, that the child-victim's mother, grandmother, and doctor testified as to what the child told them, that testimony showed the child's change of attitude, and evidence showed Bartell had an opportunity to commit the crime. In concluding that this "overwhelming evidence" renders admission of the videotape harmless, the majority disregards the substance of the *Burke* opinion and wholly fails to discuss the harmful effects of the videotape.

The question here is not whether Bartell was able to confront and cross-examine the child-victim at trial, but whether such opportunities were available for the videotaped statement. *Burke,* 820 P.2d at 1348. They were not. Use of the videotape allowed the State to improperly bolster the child-victim's evidence by "essentially present[ing] its principal witness twice." *Burke, id.* As in *Burke,* the child-victim testified and was cross-examined but her testimony was not impeached. In addition the State three times asked the jury in closing argument to remember the child-victim's statements on the videotape. The majority mischaracterizes the other witnesses' testimony as "mirroring" that of the child when the adults' evidence was actually clearer and more coherent. Not unsurprisingly, the child's testimony gave a consistent account of the crime but was vague as to details. While the child-victim was certain who had committed the crime, she was unable to identify Bartell in court (identification was proved through other witnesses).

Any harmless-error analysis must include both the admissible evidence against a defendant and the harm in fact caused by the error. Other evidence was presented against Bartell. However, the State had the opportunity to improperly bolster the testimony of

---

1. I am puzzled by the second paragraph of footnote 4 in the majority opinion. This is indeed a direct appeal from a trial held in a district court of Oklahoma, and any reference to either state or federal habeas corpus provisions is irrelevant.

The majority's cite to *Brecht v. Abrahamson,* — U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which concerns the proper standard for federal habeas corpus relief, is inapposite as well as unnecessary.

their principal witness and took advantage of that opportunity in argument. In the video-tape the jury saw and heard the child-victim respond to questions with an uncontradicted and unexamined account of the crime. I cannot say beyond a reasonable doubt that this evidence did not contribute to the verdict. I would reverse Bartell's conviction and remand for a new trial.