2010 OK CR 8

**Billy Gene MARSHALL, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2008–1170.

Court of Criminal Appeals of Oklahoma.

May 13, 2010.

Marny Hill, Assistant Public Defender, Tulsa, OK, counsel for appellant at trial.

Tim Harris, District Attorney, Jack Thorp, Lee Berlin, Assistant District Attorneys, Tulsa, OK, counsel for the state at trial.

Stuart W. Southerland, Assistant Public Defender, Tulsa County Public Defenders Office, Tulsa, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Donald D. Self, Assistant Attorney General, Oklahoma City, OK, counsel for the state on appeal.

OPINION

LUMPKIN, Judge.

¶ 1 Appellant Billy Gene Marshall was tried by jury and convicted of First Degree Murder (21 O.S.Supp.2004, § 701.7) and First Degree Robbery (21 O.S.2001, § 797), After Former Conviction of Two or More Felonies, Case No. CF–2006–2922, in the District Court of Tulsa County. The jury recommended as punishment life imprisonment without the possibility of parole for the murder conviction and life imprisonment for the robbery. The trial court sentenced accordingly, ordering the sentences to run consecutively. It is from this judgment and sentence that Appellant appeals.

¶ 2 Appellant was convicted of the brutal murder and robbery of seventy-one year old Alonzo Tibbs, Jr. Mr. Tibbs, also referred to as the decedent, was a retired employee of American Airlines and worked part time as a salesman for Prepaid Legal. He lived with his girlfriend of eleven years, Jennifer Jones Garrett, on North Hartford Avenue in Tulsa, Oklahoma. To those he knew, the decedent was more than willing to loan money in times of need.

¶ 3 On June 14, 2006, Ms. Garrett left for work at approximately 7:20 a.m. Mr. Tibbs was up and planned to wash and wax his Cadillac that morning. He was to meet Ms. Garrett later that day at her place of work and exchange vehicles. When he had not shown up by one o'clock, Ms. Garrett began phoning Mr. Tibbs. She called him several times on his cell phone and on the house phone. She never received an answer. Ms. Garrett left work after 5:00 p.m., and attempted to locate Mr. Tibbs by calling his cell phone and his friends. She arrived home at approximately 6:00 p.m., to find the front door of her home ajar. She thought it unusual as the front door was usually either wide open or completely shut. Upon entering the house, she called out for Mr. Tibbs. Receiving no response, she walked toward the bedroom. She saw the decedents legs on the bedroom floor and called out his name. Again receiving no response, she called the police.

¶ 4 The police arrived to find Mr. Tibbs had been beaten to death. There was a large amount of blood in the bedroom with blood spatter and blood transfer all over the bedroom. The screen to the bedroom window had been pushed out and was lying on the grass outside of the house. The window itself was open.

¶ 5 Mr. Tibbs suffered injuries from twelve blows to the head from a blunt instrument. His face had been beaten to a bloody pulp. The right side of his forehead was caved in due to extensive skull fractures caused by the blows. The state medical examiner determined the cause of death was blunt head trauma and that his injuries were consistent with being attacked with a hammer. Mr. Tibbs also suffered small scrapes, tears or lacerations on his fingers, suggesting the possibility of defensive injuries. Mr. Tibbs wallet, which he always kept in his pants pocket, was missing.

¶ 6 Mr. Tibbs was last seen alive on June 14 at approximately 11:30 a.m. when his neighbor Glen Humphrey saw him washing his Cadillac. The two men spoke briefly and Mr. Tibbs said he was not feeling well. Mr. Humphrey thought it was probably due to the heat and suggested Mr. Tibbs go inside and lay down. The men concluded their conversation and Mr. Humphrey left with Mr. Tibbs still outside.

¶ 7 Between 11:30 a.m. and noon that day, Nathaniel Jacobs, Sr., a next door neighbor to Mr. Tibbs, noticed the trunk to Mr. Tibbs Cadillac was open but Mr. Tibbs was not around the car. Mr. Jacobs had never seen that happen before. He thought that something was wrong somewhere as his dog had been barking in the direction of Tibbs house around noon that day. At approximately 3:30 p.m., Mr. Jacobs returned from an errand to find the car trunk was still open. Mr. Jacobs knocked on the front door of Tibbs home but received no answer. Looking inside the large picture window, he saw flies inside the house. Finding all of this unusual, Mr. Jacobs told his wife who called Mr. Tibbs home phone. She received only a voice recording. Mr. Jacobs left for another errand but soon returned unable to get the vision of the flies out of his mind. When he returned to Mr. Tibbs house and looked in the window a second time, the flies had increased. Again, no one came to the door when Mr. Jacobs knocked. He closed the trunk to Mr. Tibbs car as he left.

¶ 8 On June 14, 2006, an arrest warrant was issued for Appellant for the May 30 robbery of the J & J Bargain Depot in Tulsa. The store clerk, Ms. Washington, had been attacked by a black man armed with two hammers. Detectives received an anonymous tip that Appellant was involved in the robbery. As a result, a photographic lineup was prepared and Ms. Washington identified Appellant as the man who attacked her and robbed the store.

¶ 9 Based upon similarities between the J & J robbery and the robbery/murder of Mr. Tibbs, Appellant was arrested for Mr. Tibbs murder on June 15. He was with his girlfriend Sheila Jones. Ms. Jones later told police that she and Appellant had lived across the street from Mr. Tibbs from September 2005 until January 2006. She said Appellant and Mr. Tibbs were acquaintances and that Appellant had borrowed money from Mr. Tibbs. Ms. Jones and Appellant moved twice before ending up at 4204 N. Frankfort where they lived at the time of Mr. Tibbs murder. Ms. Jones was employed, but Appellant was not. She gave Appellant money to repay the loan from Mr. Tibbs but she did not know if he ever actually paid Mr. Tibbs. She also gave Appellant money to pay the rent but he never paid the landlord and she did not know what happened to the money.

¶ 10 On the day of the murder, Appellant, dressed in a white t-shirt and jeans, left about 9:00 a.m. saying he was going to make a hustle. Ms. Jones understood this to mean Appellant was selling tires to make money. Appellant returned to his house between 1:00 and 1:30 that afternoon to take Ms. Jones to work. However, he had changed clothes and was wearing a striped shirt and shorts he said he got from his brother.

¶ 11 That night, Ms. Jones saw a story on the news about a body found at a house on 46th Street and North Hartford Avenue. When she told Appellant, he identified the location as Mr. Tibbs home and said the last time he saw Tibbs, he was talking to a hooker.

¶ 12 The next day, June 15, Ms. Jones drove by Mr. Tibbs home on her way to work. She noticed a lot of cars at the house and wondered if they were having a family reunion or a funeral or something. Appel-

lant who was with her in the car, told her to go on, it was only the police and that was where they found the dead man. Ms. Jones drove on to her sisters home nearby and that was where Appellant was apprehended.

¶ 13 After police searched her house on North Frankfort, Ms. Jones conducted her own search. She found the striped shirt, shorts, and shoes Appellant wore the afternoon of the murder. Ms. Jones informed police, who returned with a search warrant and seized the items. Ms. Jones also gave the police information about a house at 1524 E. 51st Place North where she and Appellant had lived until mid May 2006, between the time they lived on Hartford Avenue and North Frankfort. They had been evicted for failure to pay rent and the eviction notice on the door was in Appellants name. Ms. Jones had moved everything out of the house except for a twin bed, some clothing and trash. When the police arrived at the house on June 15, they found a full trash can next to the refrigerator. In the top of the trash can was some rotten food and several dirty baby diapers. At the bottom of the trash can was a flannel sheet wrapped around several bloody items of clothing. In a bedroom closet police found a tool kit containing a small hammer.

¶ 14 Ms. Jones later identified the cloth the items were wrapped in as her grandsons receiving blanket. Inside the blanket were found bloody socks, which Ms. Jones identified as the type of tube sock worn by Appellant. A lottery receipt and Prepaid Legal brochure with blood on them were also found inside the blanket. Additionally, a black t-shirt and bloody pair of jeans containing a wallet in the front pocket were found. The wallet contained Mr. Tibbs identification but no money. Ms. Jones identified the black t-shirt and jeans as items she had purchased for Appellant.

¶ 15 The socks and jeans subsequently tested positive for blood and DNA testing showed matches for Appellant and Mr. Tibbs. Concerning the socks, a comparison with Mr. Tibbs known DNA could not exclude him as a donor and the probability of selecting an African–American at random who could have contributed the DNA was 1 in 950 trillion. Appellant could not be excluded as a DNA donor but a statistical value could not be reported.

¶ 16 Blood on Appellants jeans was tested and DNA from both Mr. Tibbs and Appellant was found. Mr. Tibbs could not be excluded as a major donor of the DNA with the probability of selecting at random an African–American who could have contributed the information as 1 in 950 trillion. Appellant could not be excluded as a minor contributor of the DNA in the sample with the probability of selecting at random an African–American who could have contributed the sample as 1 in 14 million.

¶ 17 When interviewed by police, Appellant admitted going by the decedents home the morning of the murder and seeing Mr. Tibbs washing his Cadillac. Appellant claimed he spent the morning of the murder helping his half-brother, William Mayberry, cleaning gutters at a daycare on 51st Street. Appellant said he saw three people in the area of Mr. Tibbs home that morning. He claimed they were known as Showboat, Moses, and a hooker.

¶ 18 The police were unable to locate any of the people named by Appellant. William Mayberry testified that he saw Appellant some time prior to the time of the murder and they visited for about 20 minutes. However, he could not remember if the day was June 14 or another day. He did remember though that Appellant did not help him clean out gutters on June 14. Appellants niece, Sasha Mayberry, testified that she saw Appellant the day after the murder and that he was acting weird. She asked him if he had anything to do with the murder the day before, and he walked away without responding to her question.

¶ 19 Appellant chose not to testify at trial. Instead he presented a stipulation which read, Corporal Stout would testify that on June 16, 2006, he talked to Debra Mayberry, and she said Billy Marshall came to her house on Wednesday June 14, 2006. Additional facts will be set forth as necessary.

¶ 20 In his first proposition of error, Appellant contends he was denied a fair trial when Mr. Jonathan Wilson of the Tulsa Police Department Forensic Laboratory was

allowed to testify as a substitute for Dr. Valerie Fuller regarding the DNA testing she had conducted. Appellant asserts Mr. Wilson's testimony violated Oklahoma statutory law and the Confrontation Clause of the United States Constitution.

¶ 21 Dr. Valerie Fuller conducted the forensic testing of the bloody clothing in this case, but by the time of trial had gone to Iraq to set up a lab facility and teach DNA testing procedures to Baghdad police officers. Prior to trial, defense counsel requested a continuance specifically noting Dr. Fullers absence and arguing her absence denied Appellant his right of cross-examination. The continuance was denied and Mr. Wilson was permitted to testify in Dr. Fullers place as an expert witness testifying on the basis of the work of a colleague.

¶ 22 The trial court found that Mr. Wilson was fully qualified as an expert in DNA analysis. Mr. Wilson had worked with Dr. Fuller on prior occasions and had previously reviewed her work. He testified that in this case he conducted a technical review of Dr. Fullers report, reviewing all case files, notes and worksheets to make sure the proper procedures were followed, the data which was generated was reflective of the work conducted, and that the statements and conclusions in the report could be verified by the results obtained.

¶ 23 Mr. Wilson testified he found one difference in Dr. Fullers statistical analysis regarding the minor contributor of the DNA found on jeans belonging to Appellant. He found one transposed number and corrected it by issuing a corrected report prior to trial. Dr. Fullers report and Mr. Wilson's corrected report were both admitted into evidence.

¶ 24 A trial courts ruling admitting or excluding evidence is reviewed on appeal for an abuse of discretion. *Williams v. State,* 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724. An abuse of discretion has been defined as a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *State v. Love,* 1998 OK CR 32, ¶ 2, 960 P.2d 368, 369.

¶ 25 In *McCarty v. State,* 1998 OK CR 61, ¶ 88, 977 P.2d 1116, 1137–1138, this Court upheld the admission of testimony from the Chief Medical Examiner concerning an autopsy which he did not personally perform.[1] This Court found the Chief Medical Examiner was qualified to testify as to the matters shown in the autopsy and that any questions regarding his testimony went to the weight and credibility of the testimony, not its admissibility. This Court relied on 63 O.S.1991, § 935 *et. seq.,* setting forth the duties of the Chief Medical Examiner which included appearing in court to testify, and on 12 O.S. 1991, § 2703.[2] This Court held that pursuant to § 2703, an autopsy report constitutes facts or data of a type reasonably relied upon by the Chief Medical Examiner as an expert in forming opinions or inferences upon a subject and was therefore admissible evidence. *Id.,* 1998 OK CR 61, ¶ 89, 977 P.2d at 1137.

¶ 26 Since *McCarty* was decided, the United States Supreme Court issued *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). In that case, the Supreme Court found that reports or certificates of analysis prepared by analysts at the state crime laboratory showing the results of the forensic analysis on a seized controlled substance and prepared for use in a criminal prosecution were testimonial evidence subject to the demands of the

---

1. *See McCarty v. State,* 2005 OK CR 10, 114 P.3d 1089, on post-conviction, the conviction was reversed, the death sentence was vacated, and the case remanded for a new trial.

2. 12 O.S.1991, § 2703 provided:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.
 An amendment, effective November 1, 2009 adds the following language:
 Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Confrontation Clause as set forth in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Supreme Court further held that [a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial. *Id.*, 129 S.Ct. at 2532 *citing Crawford*, 541 U.S. at 54, 124 S.Ct. 1354 (emphasis in original). The Supreme Court reiterated the non-exclusive class of statements which are testimonial in nature which included affidavits that declarants would reasonably expect to be used prosecutorially. *Id.*, 129 S.Ct. at 2531–2532. Because there was no showing that the analysts were unavailable to testify at trial and that Melendez–Diaz had a prior opportunity to cross-examine them, the Supreme Court held that the admission of the certificates alone violated the defendants rights under the Confrontation Clause.

■ ¶ 27 Under the circumstances of this case, there is little doubt that Dr. Fullers report was prepared for use in a criminal trial. Therefore, it falls under the category of testimonial evidence subject to the demands of the Confrontation Clause. *See Melendez–Diaz*, 129 S.Ct. at 2531–2532.

¶ 28 Our analysis does not end here. Dr. Fuller did not testify at the preliminary hearing in this case. The DNA report she prepared was stipulated to by the defense for purposes of preliminary hearing only. Therefore, Appellant did not have an opportunity prior to trial to cross-examine Dr. Fuller or her findings in the DNA report.

¶ 29 At trial, Mr. Wilson testified solely to the findings of Dr. Fullers DNA report. He was repeatedly asked whether Dr. Fuller had a finding regarding a specific item of evidence. Mr. Wilson answered those questions by reading from Dr. Fullers report. Mr.

Wilson did not offer his own opinions concerning the DNA findings. Under these circumstances, Appellants rights under the Confrontation Clause were violated as he was denied the opportunity to confront and cross-examine Dr. Fuller in order to test her competence and the accuracy of her findings.[3] *See Wood v. State*, 299 S.W.3d 200, 213 (Tex. App.-Austin,2009)(finding autopsy reports were testimonial evidence and testimony by expert as to autopsy findings, who was not present at the autopsy, denied the defendant his constitutional right to confront the expert who conducted the autopsy); *Commonwealth v. Avila*, 454 Mass. 744, 912 N.E.2d 1014, 1027–1028 (2009) (finding error to allow testimony about findings in an autopsy by expert who did not conduct autopsy because the autopsy findings were inadmissible hearsay and they violated the Confrontation Clause).[4]

■ ¶ 30 While Rules of Evidence cannot trump the Sixth Amendment, *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, *Melendez–Diaz* does not do away with 12 O.S.2001, § 2703. ([A]s a matter of expert opinion testimony, a physicians reliance on reports prepared by other medical professionals is plainly justified in light of the custom and practice of the medical profession. Doctors routinely rely on observations reported by other doctors ... and it is unrealistic to expect a physician, as a condition precedent to offering opinion testimony to have performed every test, procedure, and examination himself). *Avila*, 912 N.E.2d at 1028–1029. However, § 2703 must be read in conjunction with the Confrontation Clause. This requires the expert witness testimony must be confined to his or her own opinions and the expert must be available for cross-examination.

■ ¶ 31 In accordance with *Melendez–Diaz*, we find the trial court abused its dis-

3. Implicit in the testimony of any expert witness is the ability to form an independent opinion based on the evidence and materials reviewed. If Mr. Wilson had formed and testified to his own independent opinion the issue would be moot.

4. Compare *State v. Crager*, 116 Ohio St.3d 369, 879 N.E.2d 745 (2007) where the Ohio Supreme Court held that based on its own interpretation of Crawford, DNA reports were properly admitted under the hearsay exception of business rec-

ords and a criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing. However, in *Crager v. Ohio*, —— U.S. ——, 129 S.Ct. 2856, 174 L.Ed.2d 598 (2009) the Supreme Court vacated the judgment and remanded the case for further consideration in light of *Melendez–Diaz*.

cretion in allowing Mr. Wilson to testify to the findings of Dr. Fuller contained in Dr. Fullers DNA report. However, violations of the Confrontation Clause are subject to harmless error analysis. *Livingston v. State*, 1995 OK CR 68, ¶ 17, 907 P.2d 1088, 1093; *Bartell v. State*, 1994 OK CR 59, 881 P.2d 92, 99. Therefore, we must determine, in context of the other evidence presented, whether the error in admitting Mr. Wilson's testimony regarding the DNA evidence was harmless beyond a reasonable doubt. *Id.*

¶ 32 In this case that means looking at the evidence without consideration of the DNA evidence. This other evidence showed that Appellant knew the decedent and until six months before the murder, had lived across the street from him. Appellant was unemployed and was frequently short of money. Appellant had borrowed money from the decedent in the past. Ms. Jones, Appellants girlfriend, gave him money to repay the decedent, but she did not know if he ever did. Ms. Jones also gave Appellant money to pay their rent, but Appellant failed to do so.

¶ 33 The morning of the murder, Appellant told Ms. Jones he was going to make some money, presumably by selling tires. When he returned home that afternoon, he was wearing clothes different from what he had on that morning. He told Jones he got the clothes from his brother with whom he had cleaned out gutters that morning. However, Appellants brother had not seen Appellant that day and had not given him any clothes. The socks and jeans Appellant wore that morning were found bloodied and hidden in the bottom of a trashcan in a house where Appellant lived after he moved from the decedents neighborhood. The decedents wallet was found in Appellants jeans pocket. No money was found in the wallet. Police were subsequently unable to locate any of the people named by Appellant as seen around the decedents home near the time of the murder. Further, the decedents injuries were consistent with being attacked with a hammer. Approximately two weeks prior to the murder, Appellant robbed a store in Tulsa and attacked the clerk with a hammer.

¶ 34 This evidence, independent of the DNA evidence, sufficiently supports the jury's verdict of first degree murder and first degree robbery. While DNA evidence can be very persuasive evidence for the jury to consider, on appeal we can review the properly admitted evidence to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *See Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559 (standard of review for sufficiency of evidence). Here, we are satisfied beyond a reasonable doubt that the improperly admitted DNA evidence did not contribute to Appellants conviction or punishment. This is especially true in that defense counsel was able to thoroughly cross-examine the DNA expert and point out weaknesses in the evidence. The expert responded to each question asked and was thoroughly familiar with the evidence and method of testing. It is hard to imagine additional questions that would have been asked if Dr. Fuller had been there in person.

¶ 35 Appellant raises additional challenges to the DNA evidence. In Proposition One, he asserts the State failed to comply with its obligation under 22 O.S.2001, § 751.1(C)(2) to present as a witness any person, specifically Dr. Fuller, in the chain of custody. In Proposition Two, Appellant asserts that admission of testimony by Mr. Wilson concerning the DNA found on one of the socks retrieved from the trash can for which a statistical analysis was not shown was reversible error. In Proposition Four, he contends the trial court erred in denying his motion for a continuance based in part on Dr. Fullers unavailability to testify at trial. In light of our finding that a Confrontation Clause error occurred in the admission of the DNA evidence but that such error was harmless beyond a reasonable doubt, it is not necessary to further address these separate allegations of error.

¶ 36 In Proposition Three, Appellant asserts the States presentation of evidence of the J & J Bargain Depot robbery was improper other crimes evidence which warrants reversal of his conviction for a new trial.

¶ 37 The basic law is well established—when one is put on trial, one is to be convicted—if at all—by evidence which

shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. *Lott v. State*, 2004 OK CR 27, ¶¶ 40–41, 98 P.3d 318, 334–335, *citing Burks v. State*, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds, Jones v. State*, 1989 OK CR 7, 772 P.2d 922.

 ¶ 38 However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity. *Id.* To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. *Id.* When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed. *Id.* Where, as here, the claim was properly preserved, the State must show on appeal that admission of this evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right. *Id.*

¶ 39 The State timely filed a *Burks* notice in this case detailing the evidence to which Appellant now objects and requesting its admission for the purpose of proving identity or common scheme or plan, or any other proper purpose.

 ¶ 40 Here, the other crimes evidence involved the use of a distinctive weapon in a distinctive manner. In the J & J robbery, Appellant used a hammer to strike the clerk on the back of the head in order to incapacitate her. An investigating officer testified that in his 35 years as a police officer, he had never seen a hammer used as a weapon in a robbery. Mr. Tibbs was killed by multiple blows to the head with a blunt instrument. While the medical examiner could not definitely say the murder weapon was a hammer, the injuries were consistent with blows from a hammer. Mr. Tibbs wallet was not found in his pants pocket where it was usually kept but in a trash can in a house where Appellant previously lived. The J & J robbery was committed on May 30, 2006, less than five miles from where Mr. Tibbs lived and was murdered on June 14, 2006. Ms. Washington, the J & J store clerk, identified Appellant from a photographic line-up and at the trial in that case. The admission of this evidence is consistent with the analysis and admission of like evidence this Court set out in *Pickens v. State*, 1988 OK CR 35, ¶ 3, 751 P.2d 742, 743, and *Williams v. State*, 2008 OK CR 19, ¶¶ 36–39, 188 P.3d 208, 218–219.

¶ 41 Evidence of the J & J robbery was properly admitted as probative of the identity of Mr. Tibbs assailant as it tended to prove that it was Appellant who beat Mr. Tibbs to death with a hammer. *See* 12 O.S. 2001, § 2403. This probative value was not substantially outweighed by the danger of unfair prejudice in light of the instruction given to the jury limiting their consideration of the evidence. The court actually issued two limiting instructions a verbal one before Ms. Washington's testimony and a written one at the close of evidence. This instruction has been found to effectively limit the jury's use of other crimes evidence. *See Lafayette v. State*, 1985 OK CR 5, ¶ 15, 694 P.2d 530, 532.

 ¶ 42 We note that in this case, the written instruction did not specifically list the identity exception, setting out that the evidence was received on the issue of the defendants alleged motive, opportunity, intent, preparation, common scheme or plan. Counsel did not object to this instruction and we find it does not constitute plain error. The purpose of the limiting instruction was adequately met in instructing the jury that the other crime was not to be considered as proof of guilt or innocence of the charged offense. This proposition of error is denied.[5]

5. Appellant argues in passing that improper hearsay was admitted during the testimony from

¶ 43 In his fourth proposition, Appellant contends the trial court erred in denying his motion for a continuance. Filed on October 31, 2008, with trial set to begin on November 3, Appellant's requested a continuance based in part on the trial judges reversal of an earlier ruling on the States offer of other crimes evidence and decision to admit the evidence. Appellant argues that since the court made its original ruling excluding the evidence on May 5, 2008, counsel had been lulled into thinking that she would only have to defend her client against the crime that he was actually charged with committing.

¶ 44 [T]he decision whether to grant or deny a motion for continuance rests within the sound discretion of the trial court and will not be disturbed absent abuse of such discretion. *Ochoa v. State,* 1998 OK CR 41, ¶ 28, 963 P.2d 583, 595. When considering the overruling of a motion for a continuance, we will examine the entire record to ascertain whether or not the appellant suffered any prejudice by the denial. *Id.*

¶ 45 Appellant has not claimed surprise and the record would not support a finding of surprise as the other crimes evidence admitted at trial was the same evidence offered by the State in its *Burks* notice filed in April 2008. Appellant's argument seems to be that additional time was needed to refute the other crimes evidence. In the motion for a continuance, counsel stated that she needed additional time to subpoena necessary witnesses. However, the necessary witnesses have never been identified. Appellant has not set out anything that trial counsel could have done differently in regards to the other crimes evidence if a continuance had been granted. At trial, defense counsel announced ready for trial with the understanding from the court that she was not waiving her motion for a continuance. However, there is no indication from the record what counsel would have done differently with more time to prepare.

¶ 46 Further, this case had been pending for two years, while Appellant was in jail, when defense counsel requested the continuance. The case had already been continued twice, once by the court and once by the prosecutor. After a thorough review of the record, we find nothing to indicate Appellant suffered any prejudice by the courts refusal to grant the continuance. The court did not abuse its discretion in denying the continuance, and this proposition is denied.

¶ 47 In his fifth proposition of error, Appellant argues that the affidavit for the search warrant of 1524 E. 51st Place lacked probable cause, in part because the affidavit failed to show the unnamed source was reliable. While Appellant filed a motion to suppress the results of the search, he did not object to the evidence when it was admitted at trial. Therefore, he has waived all but plain error review. *Seabolt v. State,* 2006 OK CR 50, ¶ 4, 152 P.3d 235, 237.

¶ 48 Before addressing Appellant's claim, we must first determine whether he has standing to contest the search. To establish standing, a defendant has the burden of proving that he had a legitimate expectation of privacy in the area searched. *Anderson v. State,* 1999 OK CR 44, ¶ 18, 992 P.2d 409, 417. Only where a defendant has a clear possessory interest in the property searched, does he have standing to object to the constitutionality of that search. *Id.* Appellant and Ms. Jones were evicted from the house on E. 51st Place in May 2006, approximately one month before Mr. Tibbs murder. Everything had been moved out except for a twin bed, some clothing and trash. The day the search warrant was executed, the grass in the yard was high and the front door was

---

the investigating officer in the J & J robbery, Detective Little. Appellant contends that over defense counsels objection, Det. Little testified that the police had received an anonymous tip that Mr. Henry Cobb and Mr. Billy Marshall were responsible for the robbery at J & J's. Appellants trial objection on the grounds of hearsay was overruled with the court agreeing with the prosecutor that the statement was not offered for the truth of the matter. This conclusion is supported by reading the testimony in context. Det. Little testified that the physical evidence from the J & J robbery yielded no leads in finding the perpetrator. It was not until police received the anonymous tip did they focus their investigation on Appellant. The hearsay rule does not preclude a witness from testifying about the actions he or she took as a result of a conversation with a third party. *Fontenot v. State,* 1994 OK CR 42, ¶ 41, 881 P.2d 69, 82.

ajar. Based upon this information, Appellant did not have an expectation of privacy in the house he abandoned.

¶ 49 Even if Appellant had standing, the affidavit was more than sufficient to support the search. In evaluating the sufficiency of an affidavit for a search warrant, this Court looks to the totality of the circumstances. *Langham v. State*, 1990 OK CR 9, ¶ 6, 787 P.2d 1279, 1281. Under the totality of the circumstances approach, the task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* In order for there to be a valid finding of probable cause enough underlying facts and circumstances must be set forth in the affidavit to enable the magistrate to independently judge the affiant's conclusion that [evidence of the crime] is located where the affiant says it is. *Peninger v. State*, 1991 OK CR 60, ¶ 6, 811 P.2d 609, 611, *quoting Asher v. State*, 1976 OK CR 59, ¶ 19, 546 P.2d 1343, 1347. The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Langham*, 1990 OK CR 9, ¶ 6, 787 P.2d at 1281. A magistrates finding of probable cause is to be given great deference. *Gregg v. State*, 1992 OK CR 82, ¶ 14, 844 P.2d 867, 874.

¶ 50 The affidavit in this case was primarily based on information police officers gathered through their own investigation including interviews with the medical examiner, Ms. Jones, Ms. Washington, and the Tulsa Housing Authority. The affidavit stated in part that police officers learned through their own investigation that the deceased died as a result of blunt force trauma to the head, that the injuries appeared to have been caused by a hammer, the deceased's wallet could not be located at the scene of the murder, and it appeared that someone had rummaged through the deceased's residence looking for items to steal with robbery as the apparent motive. The affidavit further states that on June 15, 2006, officers observed a green Toyota Camry bearing a Texas license plate near the scene of the murder. Officers stopped the car and found Appellant and Ms. Jones inside. Officers arrested Appellant on an outstanding warrant for the robbery of the J & J Bargain Depot on May 30, 2006. In the J & J robbery, Appellant used a hammer to beat the employee, Ms. Washington, while he robbed the business. During subsequent interviews with Ms. Jones the police learned that Appellant left his home the morning of June 14, 2006, to make some money, that he returned a few hours later dressed in different clothes than when he left the house, statements made by Appellant to Ms. Jones placed him near the murder scene on the day of the murder, Appellant and Ms. Jones had lived across the street from the deceased at one time, Appellant had borrowed money from the deceased in the past, and Appellant owned a hammer which he routinely kept in his car. While searching her home, Ms. Jones found a pair of blood stained shoes and a pair of bloodstained pants which belonged to Appellant. However, no hammer was found at the residence. Additionally Ms. Jones informed the police that she and Appellant had lived at the house only 3 months, having previously lived at 1524 E. 51st Place, that they were evicted due to their failure to pay rent, that Appellant still had a key to the house on 51st street and routinely went there, although she did not know what he did while he was there. Upon receiving information about the house on 51st Street, officers went to the house and found it appeared abandoned with the grass extremely overgrown, the front door unlocked and slightly ajar and trash and papers the only items visible from the windows. The affidavit also states that the Tulsa Housing Authority confirmed that Appellant and Ms. Jones used to live in the house on 51st street and that Appellant had been served with eviction papers.

¶ 51 In conclusion, the affiant, Detective Felton, stated that he had been involved in homicide investigations for over nine (9) years and that during this time he had learned that persons committing violent crimes will often times discard evidence at

abandoned residences connected with the person that committed the violent act.

¶ 52 Further, in setting out information concerning the J & J robbery, the affidavit states that a furniture store in Tulsa was robbed on May 22, 2006, and the black male suspect used an instrument to cause blunt force trauma to the store employee who suffered critical injuries as a result. The affidavit further states, [r]obbery detectives received information that Billy Gene Marshall committed the robbery as well. (Amended O.R. 26). It is this single reference to an unnamed informant, without any additional information regarding the credibility of the source, which Appellant claims dooms the affidavit.

¶ 53 Based upon a review of the entire affidavit, we find it was sufficient to provide the magistrate a substantial basis for concluding that probable cause existed to issue the search warrant. The single reference to an unnamed informant does not detract from the wealth of information specific to its source provided in the affidavit. This proposition is denied.

¶ 54 Appellant alleges in his sixth proposition of error that the trial court abused its discretion by not *sua sponte* instructing the jury to sentence Appellant in the first stage of trial for the first degree murder conviction. The record shows Appellant was convicted of first degree murder and first degree robbery. The trial court proceeded to a second stage where evidence of seven prior felony convictions was admitted pursuant to 21 O.S.Supp.2002, § 51.1. As punishment for the murder conviction, the jury recommended a sentence of life in prison without the possibility of parole.

¶ 55 We review only for plain error as Appellant did not object to the instructions regarding the use of his prior convictions or the manner in which the trial was bifurcated. See Eizember v. State, 2007 OK CR 29, ¶ 106, 164 P.3d 208, 235.

¶ 56 In McCormick v. State, 1993 OK CR 6, ¶ 40, 845 P.2d 896, 903, this Court held that bifurcation is not authorized in first-degree murder trials where the State is not seeking the death penalty, and there are no

previous convictions in other counts requiring bifurcation under 22 O.S.2001, § 860. Later, in Carter v. State, 2006 OK CR 42, ¶ 2, 147 P.3d 243, 244, we reiterated that where the State is not seeking the death penalty and there are no other charged offenses requiring bifurcation under 22 O.S.2001, § 860.1, bifurcation is not authorized. We found the bifurcation used in Carter violated McCormick. However, as the appellant suffered no prejudice, this Court found no relief was warranted.

¶ 57 In McCormick and Carter, the defendant was convicted only of first degree murder. In the present case, Appellant was charged and convicted of non-capital murder, which is not a charge requiring bifurcation, and first degree robbery, subject to bifurcation pursuant to § 860.1. Appellant raises the issue that in the recent unpublished opinion of Lewis v. State, F–2008–06 (Okl.Cr.2009) the defendant was similarly convicted of non-capital first degree murder and robbery with firearms with the allegation of prior felony convictions. This Court found that deciding punishment for both the non-enhanceable murder conviction and the enhanceable robbery conviction was improper. This Court stated:

> To make it clear, when a defendant is charged with non-capital first degree murder, as well as other felony offenses, and the defendant has prior convictions alleged on a page 2, the procedure shall be that the jury should decide guilt/innocence and punishment on the non-capital first degree murder charge, and guilt/innocence, but not punishment, for the other counts in the first stage. Punishment for the other counts should be decided during the second stage, where the prior felony convictions are introduced.
>
> This procedure is necessary, because of the incongruity which would be created if a different procedure is utilized for those only facing a murder charge versus those with a murder charge, as well as other enhanceable felonies. An enhancement stage would be created for the non-capital

murder charge, where one is not authorized by statute.[6]

¶ 58 While *Lewis* is not binding precedent of this Court, the procedure in this case violated *Lewis*. However, this Court will not reverse a conviction or modify a sentence unless we find not only error, but some prejudicial effect resulting from that error. *Carter*, 2006 OK CR 42, ¶ 2, 147 P.3d at 244. *See also* 20 O.S.2001, § 3001.1. Here, we find no prejudice as evidence of Appellants brutal beating to death of his 71 year old former neighbor, in his own home, in order to rob him and not leave any witnesses, more than supports the life without parole punishment imposed. Any error in the sentencing was harmless beyond a reasonable doubt. This proposition of error is denied.

¶ 59 In his seventh proposition, Appellant contends the combined errors in his trial denied him the right to a constitutionally guaranteed fair trial. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Williams v. State*, 2001 OK CR 9, ¶ 127, 22 P.3d 702, 732. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.* While we have found error occurring in both the first and second stages of this trial, none of these errors required reversal singly. In viewing the cumulative effect of these errors we also find they do not require reversal of this case as none were so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

¶ 60 In a *pro se* supplemental brief, Appellant raises six allegations of ineffective assistance of trial counsel. Pursuant to an order from this Court, the State responded to these claims maintaining that Appellants trial counsel provided effective assistance and no relief is warranted.

¶ 61 Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) to prove a claim of ineffectiveness, the defendant must show that counsels performance was deficient, and that the deficient performance prejudiced the defense. *Bland v. State*, 2000 OK CR 11, ¶¶ 112–113, 4 P.3d 702, 730–731. The burden rests with Appellant to show that counsels performance was deficient and that he was prejudiced thereby. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id., citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

¶ 62 Appellant first claims that counsel was ineffective for failing to cross-examine Detective Felton concerning statements used in the affidavit for the search warrant of Appellants car. Appellant contends the affidavit contains inaccurate statements. However, he does not identify what these inaccuracies might be or how they would have been corrected on cross-examination. Further, he does not state how he was prejudiced by the search of his car. The evidence linking him to the murder—the bloody jeans, socks and the decedents wallet—were found in the house on 51st, and not the car. Appellant has failed to show how he was prejudiced by counsels conduct.

¶ 63 Appellant next complains that Mr. Jacobs, the decedents neighbor, provided false evidence that before 12:20 p.m., the day of the murder, he heard his dog barking. He claims this formed the basis for the prosecutors allegedly false theory that Appellant cut his leg on the fence leaving the scene of the murder. Appellant claims he was prejudiced by counsels failure to object to this allegedly false evidence. Further, he claims the State failed to provide any pre-trial discovery concerning Mr. Jacobs testimony and defense counsel failed to raise an objection.

¶ 64 Appellant provides no information showing that Mr. Jacobs testimony was false or that there was any discovery violation. Mr. Jacobs was thoroughly cross-examined

---

**6.** In footnote 3, this Court recognized an exception where a defendant testifies and admits his prior convictions in the first stage, thereby waiving the bifurcated proceeding.

at trial without any mention of a discovery violation.

■ ¶ 65 Appellant also asserts that the prosecution had his girlfriend Sheila Jones falsely testify that the water was turned off at the house on 51st street and defense counsel failed to object to this testimony. Once again, Appellant offers no support for his claim this was false testimony. He has failed to show any prejudice by counsels conduct.

¶ 66 In his third and fourth claims of ineffective assistance, Appellant contends trial counsel failed to object to the seizure of evidence from the house on 51st street and that the search warrant was not obtained in good faith. As addressed in the fourth proposition of error above, defense counsel did file a motion to suppress the evidence seized from the house. However, based upon the trial courts overruling of that motion, counsel did not again object to the evidence when it was admitted. Also, as addressed previously, even though the property had been abandoned by Appellant and he lacked standing to object, the search warrant was valid. Therefore, we will not find counsel ineffective for failing to raise a second objection to the admission of the seized evidence.

■ ¶ 67 Appellant next finds counsel ineffective for failing to object to the DNA taken from him by buccal swab because he was not advised of his *Miranda* rights.[7] The buccal swab was obtained as the result of a valid search warrant. (Amended O.R. pgs. 3–9). Accordingly, Appellant was not entitled to advisement of *Miranda* rights prior to the execution of the search warrant. We will not find counsel ineffective for failing to raise an objection which would have been overruled. *Phillips v. State*, 1999 OK CR 38,- ¶ 104, 989 P.2d 1017, 1044.

¶ 68 Finally, Appellant claims counsel was ineffective for failing to object to the search warrant for the buccal swabs because the supporting affidavit allegedly contained falsehoods. Appellant provides only conclusory allegations in support. A review of the affidavit shows it was sufficient to support the search warrant for Appellants DNA. Appel-

lant has not shown he was prejudiced by counsels failure to object.

¶ 69 The record reflects trial counsel vigorously and competently defended Appellant in the face of overwhelming evidence of guilt. Trial counsel filed numerous motions prior to trial, and at trial, repeatedly raised and argued objections and thoroughly cross-examined witnesses. Appellant has failed to meet his burden of showing a reasonable probability that, but for any unprofessional errors by counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or punishment. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

## DECISION

¶ 70 The Judgment and Sentence is *AF-FIRMED*. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010), the *MANDATE* is *ORDERED* issued upon the delivery and filing of this decision.

A. JOHNSON, V.P.J. and LEWIS, J.: concur.

C. JOHNSON, P.J.: concur in results.

---

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).