Stephen Cletis BISHOP, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–77–645.

Court of Criminal Appeals of Oklahoma.

June 30, 1978.

John T. Elliott, Public Defender, John M. Stuart, Asst. Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., Carol Elaine Alexander, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

Appellant, Stephen Cletis Bishop, hereinafter referred to as defendant, was charged in the District Court, Oklahoma County, Case No. CRF–76–3946, with Taking Indecent Liberties With a Child Under the Age of Fourteen Years, in violation of 21 O.S. 1971, § 1123. The case was tried to a jury and a guilty verdict was returned. Punishment was assessed at twenty (20) years' imprisonment. From judgment and sentence, defendant has perfected an appeal to this Court.

The victim of the crime was alleged to be a female six years of age, and because of her age she was deemed incompetent to testify by the court.

The victim's mother stated that she lived in Midwest City and that the defendant was her half-brother, who occasionally stayed with her and who was, in fact, staying with her on October 23, 1976. On that day she had a date and prior to leaving, at about 9:00 p. m., she left the child with a babysitter. At the time the victim's mother left, the defendant was sleeping.

When the victim's mother and her date returned to the apartment, about 1:30 a. m., they first observed that the stereo was playing quite loudly. At the same time she turned down the volume of the stereo, she heard the child scream and saw her run, nude, away from the bed in which the defendant was apparently lying. The witness entered the room and observed that the defendant was, in fact, lying on a bed wrapped in a sheet. The child was in a closet, hysterical, attempting to put her underwear on. The witness stated that the room, which had been neat when she left, was in a shambles. The witness demanded an explanation from the defendant concerning what had happened, but he only replied that he did not know. She then took the child, who was screaming "He hurt me, he hurt me," into the bathroom and examined her. There were several bruises on her chest, shoulders and arms. The witness stated that, "The area of her vagina was bloody, bruised. Her rectum was red and irritated."

After examining the child, the witness once again confronted her brother, pulling the sheet off of him and observing that he was nude except for a shirt. The witness then called the babysitter and again confronted the defendant, both verbally and with her fists. When the defendant began to defend himself by hitting back, the witness' date interceded. Eventually, the defendant left and the police were called. The victim was subsequently taken to a hospital and examined. The previous witness' testimony was corroborated by her date.

The babysitter stated that she often babysat the victim and that on the night in question the victim's mother brought her to the babysitter's house about 9:00 p. m. Subsequently, at about 10:00 p. m., the defendant called her, stating that he would take care of the child. The babysitter acquiesced in this.

The occupant of the apartment below where the alleged incident happened testified that about 10:00 p. m. on the day in question, she heard a little girl scream.

Shortly afterwards, the stereo was turned up very loudly. Subsequently, she complained to the apartment security guard.

Midwest City Police Officer Phillip Anderson received a call from the security guard concerning the loud music. After pounding on the subject apartment's door for some time, he eventually was able to summon defendant, who opened the door, clad only in a bed sheet. Officer Anderson asked the defendant to turn down the music and the defendant replied that he would. While Officer Anderson was speaking to defendant, he observed a little girl standing in the hallway wearing only underwear.

Still later that evening, at about 2:00 a. m., Officer Anderson returned to the apartment in response to a "sex offense call." After investigation, the child was taken to a hospital.

Larry Cooper, technical investigator with the Midwest City Police Department, testified as to his investigation, which included photographing the victim and the scene, as well as collecting certain items of evidence.

Rodney K. Marston assisted Cooper in his investigation, and testified as to his part in it.

Dr. Steven Saltzman testified that he examined the victim and observed that the external genitalia were red. However, there was no apparent pain. Additionally, the hymen had a small tear in it which was no more than several hours old and which could have bled. Dr. Saltzman testified that these findings were consistent with the child's case history. Several bruises were also noted about the body. Laboratory tests revealed the presence of no male ejaculate.

Melvin Hett, forensic chemist for the Oklahoma City Police Department, performed tests on several of the items which had been taken from the apartment where the incident allegedly occurred. The presence of semen was found on one of the sheets and blood was found on the victim's underwear.

The defendant testified and denied all material allegations of the State's case.

The defendant's first assignment of error is that certain testimony of the victim's mother, wherein she recited certain statements made by the victim, were hearsay and inadmissible. According to the child's mother, when she first confronted the defendant in the bedroom the child was hysterical and kept screaming "He hurt me, he hurt me." These statements, though hearsay, were admitted at trial under the "excited utterance" exception to the hearsay rule. The defendant contends that since the victim was deemed incompetent to testify because of her age, any rationale for admitting excited utterances as an exception to the hearsay rule is thereby negated and that, therefore, the excited utterances of the child should have been excluded.

The defendant cites *People v. McGee,* N.Y., 1 Denio 19 (1845), which holds "that when the person upon whom the offence is charged to have been committed is incompetent, . . . to be sworn and give evidence as a witness, that no evidence of the assertions or declarations of such person, descriptive of the offence or the offender, can be received in evidence; . . ."

The rule just stated is, however, by no means universal. See, 83 A.L.R.2d 1368, Declarant's age as affecting admissibility as res gestae.

This precise issue seems never to have been passed on by this Court. The cases cited by the State are inapposite. See, *Bouie v. State,* 9 Okl.Cr. 345, 131 P. 953 (1913); *Frazee v. State,* 79 Okl.Cr. 224, 153 P.2d 637 (1944); *Munn v. State,* Okl.Cr., 459 P.2d 628 (1969); and *Webb v. State,* Okl.Cr., 538 P.2d 1054 (1975). In each of these cases, the victim of the attack was competent to testify and, in fact, testified.

■ Hearsay evidence is excluded because there is no way to test the credibility of the declarant; an excited utterance is admissible though hearsay, because it is thought to have independent indicia of reliability. That is, an excited utterance made contemporaneous with a specific event, which relates to or describes the event, is held to be reliable because its nearness to the stimulating event excludes the possibility of premeditation and fabrication. See, *Chastain v. State,* 46 Okl.Cr. 123, 287 P. 826 (1930).

■ We are of the opinion that the fact a witness is ruled incompetent to testify because of age does not by itself negate the independent indicia of reliability which excited utterances possess, and which are the key to their admissibility. In a long line of cases, the Texas Court of Criminal Appeals has ruled that complaints of illicit sexual activity by an infant who was later ruled incompetent to testify are nonetheless admissible as part of the "res gestae." See, *Kenney v. State,* Tex.Cr., 79 S.W. 817 (1903); *Thomas v. State,* 47 Tex.Cr. 534, 84 S.W. 823 (1905); *Watkins v. State,* 78 Tex.Cr. 65, 180 S.W. 116 (1915); *Dickey v. State,* 147 Tex.Cr. 588, 183 S.W.2d 469 (1944); *Jones v. State,* 156 Tex.Cr. 2, 238 S.W.2d 529 (1951). See also, *People v. Butler,* 249 Cal.App.2d 799, 57 Cal.Rptr. 798 (1967); *Johnston v. Ohls,* 76 Wash.2d 398, 457 P.2d 194 (1969); *Welch v. Jordan,* 159 Me. 436, 194 A.2d 841 (1963).

■ In many of the Texas cases cited above, the res gestae declarations occurred many minutes and sometimes hours after the attack. Herein the statements were made contemporaneous with the offense and they thus possess greater reliability than those involved in the Texas cases. We therefore hold that it was proper to admit the out-of-court declarations of the infant victim.

The defendant's next assignment of error is that the verdict was excessive. Defendant received the maximum term of imprisonment allowed by law for the crime for which he was convicted, 20 years' imprisonment.

■■ As stated many times before, this Court will not disturb a jury's verdict unless considering all the facts and circumstances of the case the punishment is so excessive as to shock the conscience of the Court. See, *Lamascus v. State,* Okl.Cr., 516 P.2d 279 (1973). Considering all the facts

of this case, we are unmoved by defendant's plea.

Defendant's final assignment of error asserts that he was erroneously precluded from cross-examining the victim's mother, with respect to a certain subject. The record reflects the following during cross-examination:

"Q. Now, when you say—okay. As a child growing up did you have an experience like this?

"MR. FLAUGHER: Objection as being incompetent, irrelevant and immaterial.

"THE COURT: You mean this witness?

"MR. PEARSON: Yes.

"THE COURT: Sustain the objection. "Now, Mr. Pearson, if you can show me some connection, I'll admit it. But offhand I don't see any connection at all.

"MR. PEARSON: May we approach the bench, Your Honor?

"THE COURT: Sure.

"(Out of the hearing of the jury:)

"MR. PEARSON: Your Honor, this witness—from the information I have, this witness suffered the same type of incident by her father. Mother did come in and see this girl and she was being pushed away.

"THE COURT: What connection—

"MR. PEARSON: It shows that she had a preconceived idea what might be happening. It goes to show her irrational behavior, her jumping to this conclusion this is what happened because she had suffered a similar almost identical situation.

"THE COURT: What do you say to that?

"MR. FLAUGHER: If the Court please, it would be for the jury to determine what happened out there. All she can testify to is what she observed that night. Any prior acts that might have occurred to her, it might make her mad at the time it happened.

"MR. PEARSON: Your Honor—

"THE COURT: I sustain the objection at this time. I might later let you recall her if I determine it's competent, but right now I don't see its admissibility."

 Certainly whether or not the victim's mother had suffered a similar attack when she was young is a collateral matter. And, while the permissible scope of cross-examination is broad, it nonetheless has its limits. These limits are determined in the first instance by the trial court, and this Court has often held that unless the defendant can show that the trial court abused its discretion by unduly restricting the extent of cross-examination, no claim of error will lie. See, *Johnson v. State,* Okl.Cr., 386 P.2d 336 (1963).

 The defendant urges that whether the victim's mother suffered a similar attack could have affected her perceptions of what occurred on the night in question, and this is probably true in some subtle way. However, absent something more concrete than psychological theorizing, we are unable to conclude that the trial court abused its discretion in denying the defendant an opportunity to cross-examine the witness with regard to this obviously collateral matter.

For the foregoing reasons, the judgment and sentence is *AFFIRMED.*

BUSSEY, P. J., and CORNISH, J., concur.