2011 OK CR 8

**Lawrence Jamere TAYLOR, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2009–486.**

Court of Criminal Appeals of Oklahoma.

Feb. 16, 2011.

Richard Couch, Asst. Public Defender, Tulsa, OK, attorney for defendant at trial.

Jason Rush, Asst. District Attorney, Tulsa, OK, attorney for the State at trial.

Stuart Southerland, Asst. Public Defender, Tulsa, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Keeley L. Harris, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

## OPINION

LEWIS, Vice–Presiding Judge.

¶ 1 Lawrence Jamere Taylor, Appellant, was tried by jury in the District Court of Tulsa County, Case Number CF–2008–2033, and found guilty of Count 1, murder in the first degree, in violation of 21 O.S.Supp.2006, § 701.7(A); and Count 2, shooting with intent to kill, in violation of 21 O.S.Supp.2007, § 652(A). The jury sentenced him to life imprisonment without possibility of parole in Count 1, and life imprisonment in Count 2.[1] The Hon. William C. Kellough, District Judge, pronounced judgment and sentence, ordering the terms served consecutively. Mr. Taylor appeals.

## FACTS

¶ 2 Sometime in mid-April, 2008, Anthony Baltazar bought a stereo from the Appellant's brother, Joekele Venson. Baltazar met the Appellant for the first time at Big Joe's stereo shop, where the sound system was being installed. Baltazar later discovered that the stereo would not work. He was able to make contact with Appellant, and through him, tried to make arrangements for Joekele Venson to return the money paid for the stereo.

¶ 3 The State presented evidence that Appellant and Baltazar exchanged a series of text messages and phone calls to arrange a meeting near the Ashley Park apartment complex, between Sheridan and Yale Avenues on 71st Street in Tulsa. Appellant ac-

---

**1.** Appellant must serve 85% of these sentences prior to becoming eligible for consideration for parole, pursuant to 21 O.S.Supp.2007, § 13.1(1), (5).

tually lived approximately two hundred yards from the site of the meeting, in the Eagle Point Apartments. Anthony Baltazar and his brother-in-law, Joe Gomez, arrived at the meeting place between 10:00 and 10:30 p.m., on April 28, 2008.

¶ 4 According to Baltazar's testimony at trial, Appellant opened the rear door of Baltazar's car and got inside. He then told Baltazar to drive to the other side of the street because it was closer to his girlfriend's apartment. As Baltazar was driving to the other side of the street, he heard a shot. Baltazar remembered falling over the center console of the car. He felt his spirit ascend from his body. He asked God for a second chance, and then regained consciousness. The car had come to a stop in the parking lot. Baltazar began honking on the horn. He had been shot in the back of the head.

¶ 5 Baltazar's honking attracted the attention of a young woman in the apartments. From her second floor apartment she could see him sitting in the car, with the door open and one leg on the ground. Baltazar told her he had been shot and asked her to call 911. Baltazar's girlfriend happened to call him on the cell phone at some point. He told her he had been shot by "Joe's little brother." Tulsa Police Officer Jeff Oloman responded to the scene, finding Baltazar still sitting in his vehicle and conscious, but covered in blood. Joe Gomez was in the passenger seat, apparently dead from a gunshot wound to the head. Police recovered what proved to be the murder weapon, a .38 Special caliber revolver, lying on the rear floorboard near the front passenger seat.

¶ 6 Police traced Appellant's residence to the nearby Eagle Point Apartments, where he lived with his grandmother. The morning after the shooting, a police detective interviewed Appellant's grandmother. She told the detective that she had seen Appellant around 10:30 p.m. the night before. He ran into her apartment, sweating, and hid in a bedroom closet. When she asked him what was wrong, he said "Nothing." He then washed his hands in the bathroom, made a phone call, and left the apartment. She heard a car door slam and a car speeding away. She had not seen him since.

¶ 7 Appellant's grandmother was not the only person to see him after the crimes. Appellant called one of his friends, Cheatham, for a ride on the day after the shootings. Cheatham testified he picked up Appellant at Promenade Mall. Appellant was upset and nervous. Cheatham asked him what was wrong. Appellant replied that he had "messed up." Cheatham picked up Appellant again the following day. Appellant was still agitated. He told Cheatham he believed he had killed two Mexicans over a debt owed by him and another person. Appellant stated that he had arranged to meet the men near the Ashley Park apartments, at which point he had shot the driver and passenger from the back seat. Appellant also told Cheatham he believed he had dropped his gun. Cheatham identified the pistol recovered from Baltazar's car as Appellant's. Appellant also confessed the shooting to Cheatham's mother, Ms. Basham. She testified that Appellant told her he "shot two Mexicans," over money that he owed them. Appellant asked Ms. Basham for money to buy a bus ticket, but she offered only to help him turn himself in to police. Cheatham and Appellant then left her house.

¶ 8 Appellant also contacted another friend after the shootings, Ms. Vanco. She testified that Appellant texted her, said he needed to talk, and asked if he could come over to her house. When she asked why, he refused to tell her. He then asked if she had watched the news. She asked Appellant if he was talking about a murder at Observation Point. Appellant told her it was not that murder. Vanco then asked if it was the murder where one Mexican had been killed and another shot. Appellant said, "Yes." Appellant and Cheatham visited Vanco's house on May 1, 2008, three days after the shootings. Appellant brought a bag into the house. He stated to Vanco that someone had set him up, leaving his gun at the crime scene. He also stated that the victims had been looking for him over a problem with his brother. Appellant said he was leaving for Cleveland, Ohio, to live with his aunt. Police arrested Appellant at Vanco's apartment.

¶ 9 Police recovered Appellant's bag from Vanco's apartment. Inside they found a cell

phone bill in Appellant's name and a spent .38 caliber cartridge. Ballistics analysis of this shell casing matched it to the pistol recovered in Baltazar's car. A search of the apartment where Appellant lived with his grandmother recovered a box of Independence brand .38 Special caliber ammunition in the same closet where Appellant had hidden the night of the shooting. These cartridges were the same brand and shared the same markings as the cartridges recovered from the pistol in Baltazar's car and the spent casing found in Appellant's bag. Investigators also recovered Appellant's fingerprints from the exterior of the left rear door of Baltazar's vehicle, the interior driver's door handle and the left rear passenger door handle. Investigators found a blood transfer stain in the rear seat, probably the result of the shooter's contact with the victims as he reached into the front of the vehicle to put the transmission in park or unlock the rear doors.

¶ 10 The medical examiner testified that Joe Gomez died from a single gunshot wound to the head. The projectile recovered from Mr. Gomez was .38 caliber in size, and traveled through the brain from left to right, slightly downward, stopping in his right cheek. The bullet severed the brain stem and caused instant death. The bullet recovered from Mr. Baltazar's head was a .22 caliber bullet.

¶ 11 The defense called witnesses who testified to inconsistent statements by Mr. Baltazar concerning the identification of the shooter. He told a nurse at St. Francis Hospital that he was shot by a stranger. He told a detective that he did not know who shot him, only that the shooter was a black male. A physician's assistant testified that Baltazar was unable, or possibly unwilling, to identify the shooter. Appellant did not testify.

### ANALYSIS

¶ 12 In Proposition One, Appellant argues the evidence is insufficient to support

his conviction for shooting with intent to kill. We review Appellant's claim to determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. The elements of shooting with intent to kill are (1) intentional and wrongful; (2) shooting another person; (3) with the intent to kill any person. Instruction No. 4–4, OUJI–CR(2d). Appellant concedes the evidence is sufficient to show he murdered Joe Gomez, but urges this Court to consider that "anything could have happened," including the possibility that "a third unknown person attempted a robbery," at the same time, shooting Anthony Baltazar with a .22 caliber weapon, while Appellant may have killed Joe Gomez accidentally with the .38 pistol when Gomez attempted to take his gun.

¶ 13 Counsel's interpretation of the evidence far exceeds the scope of our review. A reviewing court must accept all reasons, inferences, and credibility choices that tend to support the verdict. *Warner v. State,* 2006 OK CR 40, ¶ 35, 144 P.3d 838, 863. Appellant's argument traces a circuitous route around direct inferences that point to him as a lone assassin, ignoring the reasonable inference that Appellant the man identified as the shooter by an eyewitness and by his own confessions to at least two other people-used two firearms in this crime. The evidence supports the inference that Appellant disposed of the missing .22 caliber firearm after the shooting; and, according to his own statements, dropped his .38 Special in his haste to flee the scene of the crime. Proposition One is denied.

¶ 14 Proposition Two argues that the district court erred by failing to give an instruction that each count should be considered separately. Counsel's failure to request such an instruction at trial waived all but plain error. *Eizember v. State,* 2007 OK CR 29, ¶ 110, 164 P.3d 208, 236.[2] Plain errors

---

2. When trial counsel raised the issue of separate consideration for each count, in response to the prosecutor's closing argument, the trial court overruled the objection and stated, in the presence of the jury, that "I think the jury under-

are those errors "which go to the foundation of the case, or which take from a defendant a right which was essential to his defense." *Simpson v. State*, 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695. Appellant argues the jury should have been instructed in the language taken from a non-uniform instruction given to the jury in *Smith v. State*, 2007 OK CR 16, ¶ 38, 157 P.3d 1155, 1168–69. Appellant cites the unpublished opinion in *Johnson v. State*, No. F–2008–1171 (Okl.Cr. Jan. 6, 2010), where the Court, with two Judges concurring in the result, said:

> Where joinder of offenses occurs, a *Smith* instruction admonishing the jury to evaluate each offense separately, demanding independent proof beyond a reasonable doubt, should be given to the jury.

*Id.*, slip. op. at 3. The unpublished opinion in *Johnson* cited no prior authority for its instructional directive, other than quoting the instruction given by the trial court in *Smith*.

¶ 15 The issue actually raised and decided by the Court in *Smith* was whether the appellant was prejudiced by the joinder of two murder charges in a single trial. *Id.*, 2007 OK CR 16, ¶ 36, 157 P.3d at 1168. The only attention given by the Court in *Smith* to the instruction later discussed in the unpublished *Johnson* decision is found in the following passage:

> Smith also asserts that the jury reached its verdict in the Moore murder on the basis of passions inflamed by the egregious facts of the Pulluru murder, especially facts relating to his gang activities. Smith points to nothing in the record, however, indicating that the jury was unable to compartmentalize the evidence with regard to each count. Furthermore, Smith's jury *was specifically instructed to give separate consideration to each offense* as follows:
>
> EVIDENCE—SEPARATE CONSIDERATION FOR EACH OFFENSE
>
> You must give separate consideration for each offense. The defendant is entitled to have his case decided on the basis of the evidence and law which is applicable to each offense. The fact that you return a verdict of guilty or not guilty on

stands there are two charges, each with their

one offense should not, in any way, affect your verdict regarding any one of the other offenses.

> (Instruction No. 6 (citing OUJI–CR 9–6))(emphasis added). Smith does not point to anything in the record *tending to show that the jury failed to follow this instruction*. With nothing but a bare allegation of prejudice, and *in light of the fact that the jury was specifically instructed to give separate consideration to each offense*, we cannot conclude that joinder of the Moore and Pulluru murders resulted in prejudice so great as to deny Smith a fair trial.

*Smith*, 2007 OK CR 16, ¶ 38, 157 P.3d at 1166 (emphasis added).

¶ 16 Footnote 6 in the *Johnson* opinion states that "we approved the trial court's adaptation of Instruction No. 9–6 to apply to a trial with multiple offenses" in *Smith*. *Johnson*, slip. op. at 3 n. 6. This statement finds no support in the relevant text from *Smith*. Certainly the matter received further attention in *Johnson*, where a majority of the Court held that such an instruction "should be given" where "joinder of offenses occurs," and "recommend[ed] this adaptation of Instruction No. 9–6, OUJI–CR(2d) to the Uniform Jury Instruction Committee." *Id.*, slip. op. at 3–4.

¶ 17 However, the Court's statement in *Johnson* that "a *Smith* instruction . . . should be given" where offenses are joined for trial, must be read in light of *Shietze v. State*, 1986 OK CR 131, ¶ 8, 724 P.2d 262, 264:

> The appellant next asserts that because the trial court failed to instruct the jury that it could not consider evidence of any crimes charged to infer that appellant was guilty of another crime charged, and because the jury should have been instructed to consider evidence as to each count separately and on its own merits, fundamental and reversible error occurred. Initially, we note that trial counsel failed to object to the instructions at trial and further failed to request that such an instruction be given. We have consistently held that when an objection to instructions does not appear in the record, it is not properly

separate elements."

preserved for appellate review and will only be reviewed for fundamental error. We find no fundamental error (internal citation omitted).

This Court also said in *Williams v. State*, 89 Okl.Cr. 146, 154, 205 P.2d 1164, 1169 (1949):

> While we recognize the rule that it is the duty of the court to instruct the jury on all matters of law which he thinks necessary for their information in arriving at a verdict ... we have often held that if special instructions are desired by the defendant, he is required by our Code of Criminal Procedure to present such instructions in writing; and it is not error for the court to omit to instruct the jury upon the issues desired, where defendant has not requested such instructions.

*See also*, 22 O.S.2001, § 856.

¶ 18 Our cases do not require that a *Smith*-type "separate consideration" instruction must be given in trials of multiple offenses, absent a timely request. The absence of such an instruction was not plain error in *Shietze*, or even more recently in *Johnson*. *Johnson* was handed down more than six months after Appellant's trial, and as the Court said in *Johnson*, "[w]e did not require the ... instruction prospectively [in *Smith* ]." *Id.*, slip op. at 4 n. 6. The trial court's instructions properly required the jury to find that the State proved the elements of each charged crime beyond a reasonable doubt. Proposition Two is denied.

¶ 19 In Proposition Three, Appellant argues that extrajudicial statements of his grandmother were admitted in violation of the rule against hearsay and his constitutional right to confront his accusers. Over Appellant's hearsay objections, the trial court admitted statements from Appellant's grandmother through the testimony of Detective Regalado. Regalado had traced Appellant's residence to his grandmother's nearby apartment, and went there around 9 a.m. the following morning to determine his whereabouts. When Regalado told Appellant's grandmother the purpose of his visit, she became visibly upset. While she was still upset, Appellant's grandmother gave a statement indicating Appellant had shown up at the apartment around 10:30 the night before,

covered in sweat, and hid in a bedroom closet of the apartment. She told Regalado that Appellant had told her nothing was wrong, washed his hands, made a brief phone call, and left. She heard a car door slam and the car speeding away. She had not seen the Appellant since that time.

¶ 20 The district court admitted the statements of Appellant's grandmother under the hearsay exception for "excited utterances," 12 O.S.Supp.2004, § 2803(2), concluding the statements met the foundational requirements set forth in *Rawlings v. State*, 1987 OK CR 135, ¶ 73, 740, 740 P.2d 153 P.2d.153, 163. The admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hancock v. State*, 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813. "Hearsay is not admissible except as otherwise provided by an act of the Legislature." 12 O.S.2001, § 2802. Section 2803(2) of Title 12 provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the startling event or condition" is not excluded by the hearsay rule regardless of the availability of the declarant.

¶ 21 An "excited utterance" under section 2803(2) must meet three foundational requirements: (1) a startling event or condition; (2) a statement relating to that startling event or condition; (3) made while the declarant is under the stress of excitement caused by the startling event or condition. *Slaughter v. State*, 1997 OK CR 78, ¶ 36, 950 P.2d 839, 852. Excited utterances are excepted from the rule against hearsay because "the spontaneity of the statement[s] in relation to the exciting event gives rise to trustworthiness," *McCalip v. State*, 1989 OK CR 46, ¶ 7, 778 P.2d 488, 490, *quoting* 1 L. Whinery, *Guide to the Oklahoma Evidence Code* 282 (Supp. 1988), and their "nearness to the stimulating event excludes the possibility of premeditation and fabrication." *Bishop v. State*, 1978 OK CR 69, ¶ 19, 581 P.2d 45, 48, *overruled in part by implication as recognized in Rawlings*, 1987 OK CR 135, ¶ 73, 740 P.2d at 163. In determining the applica-

tion of the excited utterance exception, "[t]he critical question ... is whether the statements by the declarant were spoken under the extreme stress of a startling event so that there was no time to fabricate." *Johnson v. State*, 1982 OK CR 37, ¶ 19, 665 P.2d 815, 820. As we recently stated in *Hancock*, the requirement that the hearsay statement be made while under the stress of the startling event is "particularly important; there must be no time for reflection or fabrication." *Id.*, 2007 OK CR 9, ¶ 86, 155 P.3d 796, 816, *quoting Williams v. State*, 1996 OK CR 16, ¶ 17, 915 P.2d 371, 378.

¶ 22 In *McCalip*, the trial court admitted the hearsay declarant's statement that "Jimmy hit me," made in response to questioning by his mother on the morning after the alleged incident of abuse. *Id.*, 1989 OK CR 46, ¶ 3, 778 P.2d at 489. The Court had no difficulty finding the alleged acts of abuse were a "startling event," and that the declarant's statement "relating to" that event as required by section 2803(2). The difficulty was the third foundational requirement, that the statement was made under the stress of excitement caused by the startling event. *Id.*, 1989 OK CR 46, ¶¶ 5–6, 778 P.2d at 489.

¶ 23 The facts showed that upon waking in the morning, some ten to twelve hours after the alleged abuse, the declarant wasn't walking very well or feeling very well, apparently suffering some physical pain from the abuse. When his mother asked him what was wrong, he stated "Jimmy hit me." *Id.*, 1989 OK CR 46, ¶ 4, 778 P.2d at 489. The Court in *McCalip* noted that the statements found admissible in *Rawlings* "were made within minutes following the startling event," while "[t]he fact that [declarant] slept soundly through the night makes it less probable that his statement the next morning was made while he was under the stress of excitement of a startling event." *Id.*, 1989 OK CR 46, ¶ 6, 778 P.2d at 490. The Court also found it significant that the statement was not spontaneously volunteered by the declarant, but came out only in response to questioning from his mother. *Id.* Considering the lack of both spontaneity and contemporaneity of the statements to the startling event, the Court found their admission at trial was er-

ror. *Id.*, 1989 OK CR 46, ¶ 7, 778 P.2d at 490.

¶ 24 In *Marquez v. State*, 1995 OK CR 17, 890 P.2d 980, the young hearsay declarant witnessed the murder of her parents in her home. Her brother slept through the shootings. After the killer left, she tried unsuccessfully to rouse her brother, but then fell asleep beside him. The declarant was still sleeping when a family friend discovered the bodies the following morning. The family friend took the children from the home and drove them toward their grandparents' farm. On the way, the declarant told the family friend that a "bad man came and did this," and he "looked like Yvonne's husband." *Id.*, 1995 OK CR 17, ¶¶ 7–8, 890 P.2d at 983.

¶ 25 The Court found these statements, although made several hours after the startling events to which they related, were properly admitted as excited utterances. Distinguishing the circumstances in *McCalip*, the Court found that although the declarant had slept through the night, "she had not had time for fabrication or reflection," because "when she awoke, the startling event continued to exist," and "she was just beginning to understand the fact that her parents were dead." *Marquez*, 1995 OK CR 17, ¶ 16, 890 P.2d at 984.

¶ 26 *Mitchell v. State*, 2005 OK CR 15, 120 P.3d 1196, is also instructive. There the State sought to offer hearsay statements of a child witness to a homicide, in which the declarant stated he had seen the defendant "hit the baby in the head with his hand and would pick the baby up by her feet and throw her on the floor. A bunch of times he did that." *Id.*, 2005 OK CR 15, ¶ 25, 120 P.3d at 1204. The Court in *Mitchell* held that these hearsay statements failed to meet the foundational requirements for an excited utterance:

> [The declarant] did not blurt out accusatory statements upon seeing a police officer or upon seeing someone other than a family member. [The declarant] had been around several adult family members, besides his mother and Mitchell, for at least four hours without making any such statement. Detective Edwards was experienced in, and had training, interviewing

children. He asked [the declarant] "direct" questions designed to elicit a statement from [him]. Although [the detective] said [the declarant] was "very spontaneous and voluntary at the point of his statements," all of [his] statements were in direct response to [the detective's] questions. Detective Edwards admitted he "talked a little bit about [the declarant's] life and what was going on and why he was at the hospital" and admitted he did not conduct a "full forensic interview" as he normally would ... That a hyperactive four year old, stuck in an Emergency Room waiting room for over four hours, responded to his questions does not render his words spontaneous, excited utterances ... Even if we were to find [the declarant] was still under the stress of excitement caused by the startling event, the facts do not show any of his statements to Detective Edwards were spontaneous; rather, they were made in response to direct questions whether Appellant did anything to him or his sister. Under these facts, we cannot find [the declarant's] statement to Detective Edwards admissible as an excited utterance.

*Id.,* 2005 OK CR 15, ¶¶ 28–31, 120 P.3d at 1205–06.

¶ 27 In *Hancock,* we found the trial court properly excluded hearsay statements made by the hearsay declarant to a third party within a few to several hours after the declarant was involved in a double homicide. The declarant was hurt at the time, mentally agitated, covered in blood, and carrying a gun, and made several statements about what allegedly happened during the homicides. *Id.,* 2007 OK CR 9, ¶ 87, 155 P.3d at 816. The defendant wanted these hearsay statements, made by him, admitted in his defense as excited utterances. We distinguished the statements in *Hancock* from those found admissible in *Williams,* where the Court had recognized that "shooting and killing two men certainly qualifies as a startling event," and held that defendant's exculpatory statement that it was "them or me," made within seconds of the shots, should have been admitted as an excited utterance. *Williams,* 1996 OK CR 16, ¶ 17, 915 P.2d at 378–79.

¶ 28 In *Williams,* the Court had emphasized that the "words should be one continuing transaction with the event." *Id.* By contrast, the Court found in *Hancock* that the lack of contemporaneity and the possibility of fabrication rendered the statements inadmissible:

The record does not support a conclusion that Appellant's statements to Gould were "one continuing transaction with the event" or that Appellant uttered those statements under circumstances that "exclude the possibility of premeditation and fabrication." The proffered evidence also lacks the "substantial contemporaneity of the event and the statement" that negates "the likelihood of deliberate and conscious misrepresentation." Without these traditional assurances of the statement's reliability, which alone justify an exception to the hearsay rule, the District Court did not abuse its discretion by excluding the statements from evidence at trial.

*Id.,* 2007 OK CR 9, ¶ 87, 155 P.3d at 816–17 (internal citations omitted).

¶ 29 Applying these authorities to the foundational facts shown here, the district court erred in admitting the statements of Appellant's grandmother as excited utterances. The record supports the conclusion that Appellant's suspicious appearance and behavior at his grandmother's apartment on the night of the shootings was a startling event or condition within the meaning of section 2803(2). However, the hearsay statements of the declarant "relating to" that event came almost twelve hours *later.* There is no persuasive showing here that the declarant remained under the "extreme stress" of the startling event the entire time between the event and the statements, *Hancock,* 2007 OK CR 9, ¶ 83, 155 P.3d at 816, *quoting Johnson v. State,* 1982 OK CR 37, ¶ 19, 665 P.2d 815, 820, or that the statements' "nearness to the stimulating event *excludes the possibility* of premeditation and fabrication." *Bishop,* 1978 OK CR 69, ¶ 19, 581 P.2d at 48 (emphasis added).

¶ 30 The detective's visit to the declarant's apartment the morning after the shootings, and the stated reason for that visit, appar-

ently triggered a second startling event or condition, causing the declarant renewed anguish over her grandson; but this subsequent event or condition will not justify the admission of hearsay statements relating to events almost twelve hours *earlier*. While the admissibility of hearsay statements related to a startling event "depends not upon a fixed time but on the facts and circumstances," *Williams,* 1996 OK CR 16, ¶ 17, 915 P.2d at 378–79, the lapse of time here is very different from the situation in *Marquez,* where the declarant awoke from sleep and made statements amidst the ongoing calamity of her parents' murders and the discovery of their bodies by a family friend. The substantial lack of contemporaneity undermines the reliability of the statements here and thereby defeats the rationale for the hearsay exception. *Beavers v. State,* 1985 OK CR 146, ¶ 7, 709 P.2d 702, 704–05 (finding statements made subsequent to the evening of the incident would not satisfy exception for excited utterances).

¶ 31 The statements here also lacked the spontaneity that justifies the hearsay exception for excited utterances. Like the statements this Court found inadmissible in *McCalip* and *Mitchell,* the statements here were not spontaneously uttered by the hearsay declarant, but arose in response to an inquiry initiated by the detective. *McCalip,* 1989 OK CR 46, ¶ 7, 778 P.2d at 490; *see also, Jones v. State,* 2009 OK CR 1, ¶ 53, 201 P.3d 869, 884 (holding hearsay statements given in response to investigator's questions at crime scene lacked spontaneity and would not qualify as excited utterances). We conclude that the hearsay evidence admitted here lacks both spontaneity and the " 'substantial contemporaneity of the event and the statement' that negates 'the likelihood of deliberate and conscious misrepresentation.' " *Hancock,* 2007 OK CR 9, ¶ 87, 155 P.3d at 816, *quoting* L. Whinery, *Courtroom Guide to the Oklahoma Evidence Code* 618 (West 2005). "Without these traditional assurances of the statement's reliability, which alone justify an exception to the hearsay rule," the district court abused its discretion by admitting these statements. *Hancock, id.*

¶ 32 We now turn to Appellant's claim that the admission of this hearsay violated his right to confrontation, guaranteed by the Sixth and Fourteenth Amendments and Article 2, section 20 of the Oklahoma Constitution. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that under the Confrontation Clause, testimonial hearsay statements may be admitted against the accused in a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. *Id.,* 541 U.S. at 68, 124 S.Ct. at 1374. Because the right to confrontation in the constitutional text applies to "witnesses," the proper focus is whether the challenged statement is "testimony" against the defendant, triggering the constitutional requirement of an opportunity for cross-examination. *Id.,* 541 U.S. at 51, 124 S.Ct. at 1364. There is no showing in the record that the hearsay declarant was unavailable for trial, or that the defendant was afforded a prior opportunity to cross-examine the declarant about these statements. The critical question is therefore whether these statements were testimonial within the meaning of *Crawford.*

¶ 33 The Supreme Court in *Crawford* found the admission at defendant's trial of an incriminating hearsay statement to police, obtained from the defendant's wife, violated the right to confrontation. *Id.,* 541 U.S. at 68, 124 S.Ct. at 1374. The Supreme Court discussed at least three types of "testimonial" hearsay statements subject to confrontation: *ex parte in-court testimony, extrajudicial statements contained in formalized testimonial materials, and statements made under circumstances which would lead an objective witness to reasonably believe that such statement would be available for use at a later trial. Id.,* 541 U.S. at 51–52, 124 S.Ct. at 1364. The Supreme Court went on to say that "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or

at a former trial; and to police interrogations." [3]  *Id.,* 541 U.S. at 68, 124 S.Ct. at 1374.

¶ 34 Following the Supreme Court's guidance in *Crawford,*[4] this Court in *Mitchell* found that a child declarant's hearsay responses to questions from a detective, acting in an investigative capacity and gathering facts in anticipation of a criminal prosecution, could be considered testimonial. *Id.,* 2005 OK CR 15, ¶ 37, 120 P.3d at 1207. The following year, the Supreme Court further clarified the law in the companion cases of *Davis v. Washington* and *Hammon v. Indiana,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), holding in *Davis* that hearsay statements contained in a 911 call in which the victim was seeking immediate police assistance were non-testimonial, and their admission at a subsequent trial did not abridge the right to confrontation. *Id.,* 547 U.S. at 822, 126 S.Ct. at 2273. The Supreme Court in *Davis* held that hearsay statements to police are non-testimonial when "made under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency." *Id.*

¶ 35 In the companion case, *Hammon v. Indiana,* the Supreme Court found that hearsay statements related during a police interview by a victim of domestic violence, later admitted against the husband when the victim refused to testify at trial, were testimonial and thus subject to confrontation under *Crawford. Hammon,* 547 U.S. at 830, 126 S.Ct. at 2278–79. The Court reasoned that such statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Hammon,* 547 U.S. at 822, 126 S.Ct. at 2274. We followed *Davis* recently in *Hunt v. State,*

2009 OK CR 21, 218 P.3d 516, finding that the declarant's hearsay statements on a 911 call, relating past acts of abuse by the defendant, "would be the same as live testimony" in a prosecution for those acts, and were thus "inherently testimonial and subject to the confrontation requirement." *Id.,* 2009 OK CR 21, ¶ 11, 218 P.3d at 519.

¶ 36 Applying the analysis in *Davis* to the circumstances in this case, we find the facts that two men had been shot, and that the suspect or suspects remained at large, are not dispositive of whether the hearsay statement has an emergency purpose, and is therefore non-testimonial under *Davis.* The relevant focus is clearly on what is happening to the hearsay declarant when the statements are made, rather than broader concerns of the police or the public at large. The circumstances rendering the statement in *Davis* non-testimonial included that the declarant "was speaking about events *as they were actually happening,* rather than describing past events;" that any reasonable listener would recognize that the declarant (rather than the investigator) "was facing an ongoing emergency;" that the statement "was plainly a call for help against a *bona fide* physical threat" to the declarant (again, rather than police or the public at large); that the statement was "necessary to be able to *resolve* the present emergency, rather than simply to learn what had happened in the past;" and that the declarant's "frantic answers" were given "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe" for the declarant. *Id.,* 547 U.S. at 827, 126 S.Ct. at 2276–77 (emphasis in quotes original).

¶ 37 Finding the hearsay statement testimonial in *Hammon,* the Supreme Court focused on the contrasting circumstances affecting the declarant when the statement was made. When the officers arrived to investi-

---

**3.** The Supreme Court noted in *Crawford* that it was using the term "interrogation" in its "colloquial, rather than any technical legal, sense," and that the statement of defendant's wife, "knowingly given in response to structured police questioning, qualifies under any conceivable definition." *Id.,* 541 U.S. at 53 n. 4, 124 S.Ct. at 1365 n. 4.

**4.** In the pre–*Crawford* case of *McCalip,* the Court also found that the erroneous admission of hearsay that failed to meet the foundational requirements for an excited utterance under section 2803(2), without a showing that the declarant was unavailable, violated the right to confrontation. *Id.,* 1989 OK CR 46, ¶ 8, 778 P.2d at 490.

gate the distress call in *Hammon,* there was no "emergency in progress;" the declarant "told them that things were fine;" there was "no immediate threat to her person;" and "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Hammon,* 547 U.S. at 829–30, 126 S.Ct. at 2278. The Supreme Court emphasized how the testimonial statements in both *Crawford* and *Hammon* "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and "both took place *some time after the events described were over.*" *Hammon,* 547 U.S. at 830, 126 S.Ct. at 2278 (emphasis added). Such statements "under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial." *Id.*

¶ 38 We conclude from these authorities that the statements of Appellant's grandmother were testimonial, and thus subject to the requirement of confrontation. The statements were obtained during a conversation between the declarant and an investigator who initiated the contact, seeking to locate the Appellant and to gather information concerning "past events potentially relevant to later criminal prosecution." *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273. This exchange was clearly an official interrogation of a witness in the colloquial sense defined by *Crawford.*[5] There was no ongoing emergency or request for assistance affecting the hearsay declarant, and no immediate threat to her person at the time the statements were made. The admission of these testimonial statements at Appellant's trial, without a showing that the witness was unavailable and that Appellant had been afforded a prior opportunity to cross-examine the witness about the statements, denied Appellant's constitutional right to be confronted with witnesses against him at trial. U.S. Const. amends. VI, XIV; Okla. Const. art. II, § 20.

¶ 39 Violations of the Confrontation Clause are subject to harmless error analysis. *Marshall v. State,* 2010 OK CR 8, ¶ 31, 232 P.3d 467, 476. Where this constitutional right is infringed, the remaining question is whether the error is harmless beyond a reasonable doubt. *Id.* In this inquiry, we do not ask "whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation." *Coy v. Iowa,* 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988). Instead, the question of harmful or harmless error must "be determined on the basis of the remaining evidence." *Id.; Bartell v. State,* 1994 OK CR 59, ¶ 21, 881 P.2d 92, 99. The inadmissible hearsay statement from Appellant's grandmother added incriminating details of his flight from the shootings; but the evidence properly admitted against Appellant, including eyewitness testimony, his fingerprints, his connection to the murder weapon and ammunition, and his repeated admissions, overwhelmingly affirms his guilt. The erroneous admission of this testimony had no effect on the outcome of trial and was harmless beyond a reasonable doubt. Proposition Three requires no relief.

¶ 40 Appellant's Proposition Four challenges the admission of photographs of the shooting victims. The trial court overruled Appellant's objections that the photographs failed to satisfy the tests of evidentiary relevance and balancing under 12 O.S.Supp.2003, §§ 2401–2403. Relevant evidence is defined as evidence having any ten-

---

5. The Supreme Court explained in *Crawford:*

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England … [who] had an essentially investigative and prosecutorial function. England did not have a professional police force until the 19th century, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.

541 U.S. at 52–53, 124 S.Ct. at 1364–65 (internal citations omitted).

dency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.2001, § 2401. Relevant evidence need not conclusively, or even directly, establish the defendant's guilt; it is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue. Relevancy and materiality of evidence "are matters within the sound discretion of the trial court absent an abuse thereof." *Patton v. State,* 1998 OK CR 66, ¶ 73, 973 P.2d 270, 293–94, *citing Robedeaux v. State,* 1993 OK CR 57, ¶ 60, 866 P.2d 417, 432.

¶ 41 The probative value of photographs in homicide cases can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the *corpus delicti,* depicting the crime scene, and corroborating the medical examiner's testimony. *Jones v. State,* 2009 OK CR 1, ¶ 56, 201 P.3d 869, 885. As we have said many times, "gruesome crimes make for gruesome crime-scene photographs; the issue is whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Pavatt v. State,* 2007 OK CR 19, ¶ 55, 159 P.3d 272, 290. Appellant finds it particularly problematic that some of the admitted photographs of shooting victim Joe Gomez do not directly depict his gunshot wound, and were taken after his body was removed from the car by rescue personnel and placed on the ground beside the vehicle. He calls these "posed" photographs, which simply showed "where a fireman laid Joe Gomez's body down," with any probative value being substantially outweighed by the danger of unfair prejudice.

¶ 42 With respect to State's Exhibit 31, a photograph of the surviving victim, Anthony Baltazar, Appellant complains that the photograph did not directly depict a wound, but rather was described by the victim himself at trial as a photograph of him "on his death bed" being treated after the shooting. Appellant claims this photo was offered purely for dramatic effect. Appellant seems to want it both ways: A photograph that fails to directly illustrate the wounds inflicted apparently lacks sufficient probative value for ad-

mission, while one that illustrates, even indirectly, the fact of the shootings must be excluded as unfairly prejudicial. The rules of relevance are not so easily reduced to folly.

¶ 43 The photographs of both victims were relevant in that they tended to demonstrate the facts of the shootings and suggest logical inferences about how they occurred. The photographs of Gomez showed the location of his wound; corroborated the testimony of witnesses and investigators about the crime scene and its investigation; and corroborated the testimony of the medical examiner. Appellant's declaration on appeal that certain incriminating facts were undisputed does not divest the State of the right to show the jury probative, even damaging, evidence. The photograph of Anthony Baltazar was relevant to rebut a central theme of the defense, because it showed the extreme physical circumstances under which he made inconsistent or incomplete statements about the identity of the shooter. An abuse of discretion is a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *C.L.F. v. State,* 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946. Because the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice or other countervailing factors, the district court did not abuse its discretion by admitting them in evidence. 12 O.S.Supp.2003, §§ 2401–2403. Proposition Four is denied.

¶ 44 In Proposition Five, Appellant seeks relief based on several instances of prosecutorial misconduct. He first argues the prosecutor erroneously attempted to define or dilute the burden of proof during *voir dire* and argument to the jury. Although appellate counsel objects to the prosecutor's *voir dire* on this subject, trial counsel did not. We review those comments only for plain error. The comments cited are much like those in other cases, where the prosecutor contrasts the concepts of "beyond a shadow of a doubt" and "beyond all doubt" from "beyond a reasonable doubt." Counsel also objects to comments during *voir dire* exploring the attitudes of prospective jurors about concepts of "accountability" and personal re-

sponsibility in the justice system. These comments drew an objection from defense counsel, which the court overruled.

¶ 45 The two-fold purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. The manner and extent of *voir dire* lies within the District Court's discretion. There is no abuse of discretion as long as the *voir dire* examination affords the defendant a jury free of outside influence, bias or personal interest. *Sanchez v. State*, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997. Counsel argues that because Oklahoma prohibits a definition of beyond a reasonable doubt, the discussion of reasonable doubt by prosecutors "has become a one-sided tutorial for the jury," which forces "a defense attorney to sit on his hands, unable to respond."

¶ 46 Counsel's argument ignores reality and the record in the case before us. In a passage shortly after the opening of defense *voir dire*, and without objection from the State, trial counsel discoursed for more than five pages on the presumption of innocence and the contrasting meanings of probable cause, preponderance of the evidence, clear and convincing evidence, and beyond a reasonable doubt. Among other things, defense counsel told the jury:

"There's a presumption in our system, the United States, where every person, every citizen charged with a crime, is presumed innocent;"

"And as the judge instructed you, that carries on throughout this trial until you get into the deliberation room. And until, and only if, in your deliberations, you decide the State has proved these elements, each element, beyond a reasonable doubt;"

"Because we're dealing, in cases like this, with a person's freedom. His life. That's why the standard of proof is so high in a criminal case;"

"But in a criminal case, the burden rests entirely on the State to prove these allegations ... I don't have to prove anything;"

"That's the difference in a criminal trial from a civil. The burden rests entirely on

the State, who is wanting—and claiming that he's guilty and wanting to take his freedom away, so the burden is entirely on them to prove their allegations. And if they don't do that, the presumption of innocence kicks in, and the finding must be not guilty."

¶ 47 In *Myers v. State*, 2006 OK CR 12, ¶ 57, 133 P.3d 312, 329, this Court held that the prosecutor's use in *voir dire* of the phrases "beyond all doubt," "a shadow of a doubt," "all doubt," or "any doubt," while "emphasizing the jury should closely consider the language of the jury instructions," was not the equivalent of improperly defining reasonable doubt. We also said that counsel in *voir dire* may "attempt to dispel commonly held attitudes concerning the definition of reasonable doubt." *Id.* We therefore reject Appellant's argument that the prosecutor's statements about the burden of proof in this case amounted to plain error. We also reject the argument that the prosecutor's attempt to explore juror's attitudes toward accountability somehow diminished the legal burden of proof required by the Court's instructions. There is no error here.

¶ 48 Appellant next argues that the prosecutor's comments about the 85% Rule misled the jury. The prosecutor made the following statement in closing argument:

It's probably not a shocker to you people that you don't serve your entire sentence. These instructions lay out for you the ground rules. 85 percent of life, which is equated to 45 years. The Department of Corrections decided 45 years is what a life sentence is. You serve 85 percent of that, which comes out to thirty eight years and three months or something. It's in here and it explains to you how that works. Both of these crimes are considered, under the law, to be 85 percent instructions and that's Instruction 31 and 33.

¶ 49 This statement drew no objection and we review only for plain error. In *Florez v. State*, 2010 OK CR 21, 239 P.3d 156, the Court recently found plain error in a prosecutor's misleading statement to the jury about the 85% Rule of 21 O.S.Supp.2008, § 13.1. The appellant in *Florez* was convicted of assault and battery by force likely to

produce death, and sentenced to eight (8) years imprisonment. *Id.*, 2010 OK CR 21, ¶ 1, 239 P.3d at 157. The prosecutor told the jury inclosing argument:

> And you're also given an instruction that tells you he will only do 85 percent of what you give him. He's not going to do all of it. So you've got to take that into consideration. He's only going to do 85 percent of it.

*Id.*, 2010 OK CR 21, ¶ 5, 239 P.3d at 158. Trial counsel in *Florez* requested a corrective instruction just after the argument concluded, but the trial court simply told jurors that:

> [S]ometimes people make arguments that somebody disagrees with. I'd ask you simply to read your instructions and listen to the evidence and resolve any questions you have about arguments that were made by either side.

*Id.*

¶ 50 In *Florez,* the Court found the prosecutor's argument misled the jury because section 13.1 of Title 21 "gives no authorization to automatically release a defendant before his imposed sentence is served." *Florez,* 2010 OK CR 21, ¶ 6, 239 P.3d at 158.

> [A] defendant must serve a mandatory minimum term of years before early release *may be considered.* The statutory reality is the opposite of the prosecutor's argument ... This misstatement of law grievously misled jurors into believing that Florez would, by statute, be released before serving the entirety of any term of years they imposed.

*Id.* (emphasis added). The *Florez* Court further held that the trial court's instructions failed to cure the error:

> Jurors' only frame of reference regarding the meaning of the instruction was the misstatement of law they had just heard. The trial court did nothing to correct that misstatement, leaving jurors with the impression that the prosecutor's interpretation of the instruction was correct.

*Id.*, 2010 OK CR 21, ¶ 8, 239 P.3d at 159. The Court nevertheless found the error required no relief, because the maximum sentence was life imprisonment and the jury had ignored the prosecutor's request for a sixteen

(16) year sentence by imposing only eight (8) years imprisonment. Given this disparity between the maximum sentence and the sentence imposed, appellant could not show the prosecutor's argument affected the sentence. *Id.*, 2010 OK CR 21, ¶ 9, 239 P.3d at 159.

¶ 51 We reach a similar conclusion here. The first and fourth sentences of the prosecutor's quoted statements about the 85% Rule of section 13.1 are virtually identical to the statements this Court condemned in *Florez,* because they erroneously suggest that the service of 85 percent of any sentence—85 percent of 45 years in the case of a life sentence—is followed by the prisoner's *automatic* release from custody. As we said in *Florez,* "[t]he statutory reality is the opposite of the prosecutor's argument." *Id.*, 2010 OK CR 21, ¶ 6, 239 P.3d at 158.

¶ 52 Prosecutors must be careful that their statements about the 85% Rule do not mischaracterize the statute as some form of automatic release; the statute is a limitation on a prisoner's legal eligibility "for consideration for parole" and does not guarantee or require *any* form of early release. 21 O.S.Supp.2008, § 13.1.

¶ 53 The prosecutor's error is mitigated somewhat by other statements. The second, sixth, and seventh sentences of the quoted statement directed jurors to the instructions themselves, telling jurors "These instructions lay out for you the ground rules," of the 85% law; "It's in here and it explains to you how that works" (emphasis added). While we again emphasize that "this misstatement of law would require either reversal for resentencing or sentence modification" in a proper case, we find "[u]nder the specific facts of this case, no relief is required." *Florez,* 2010 OK CR 21, ¶ 9, 239 P.3d at 159.

¶ 54 Plain error is harmless "unless it had a 'substantial influence' on the outcome, or leaves the reviewing court in 'grave doubt' as to whether it had such an effect." *Simpson,* 1994 OK CR 40, ¶ 36, 876 P.2d at 702, *quoting Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In this case, no such doubt exists. Appellant arranged and committed a

cold blooded assassination, and attempted another. He lured his victims to the scene with a false promise to settle a debt, and they came unarmed. He shot both men in the head with malice aforethought, knowingly creating a great risk of death to more than one person.[6] We do not hesitate to say that this evidence was "amply sufficient to support a verdict for murder with the extreme penalty." *Kent v. State*, 8 Okl.Cr. 188, 191, 126 P. 1040, 1041 (1912). The prosecutor's comments on the 85% Rule had no substantial influence on the outcome of trial, and no relief is required.

¶ 55 Appellant next argues the prosecutor improperly appealed for sympathy for the victims in closing argument. We evaluate allegations of prosecutor misconduct within the context of the entire trial, considering the propriety of the prosecutor's actions, as well as the strength of the evidence against the defendant, and corresponding arguments of defense counsel. *Hogan v. State*, 2006 OK CR 19, ¶ 88, 139 P.3d 907, 935. Appellant first challenges the prosecutor's arguments regarding State's Exhibit 31, the photograph of Anthony Baltazar taken after the shooting. Appellant argues the prosecutor "revealed his motive for the admission of the photograph when he emphasized Mr. Baltazar's reaction to the photograph in closing argument," as he argued for a lengthy sentence. The prosecutor reminded the jury that Baltazar had to leave the witness stand to compose himself during the trial. Viewed in the context of the prosecutor's entire argument, the statement was not an improper appeal to sympathy, but part of his request that jurors impose a just sentence based on the facts of Appellant's crimes. "The prosecutor was simply emphasizing that the issues before the jury were real, not fiction." *Roy v. State*, 2006 OK CR 47, ¶ 30, 152 P.3d 217, 227–28.

¶ 56 In the next challenged comment, the prosecutor argued:

[V]ery few people have ever been in that experience. Very few people have been put to the point where nothing else mat-

ters except your heartbeat. I would submit to that when you're in that position, talking about who did it, or talking about the names of people, is not as important as living.

Defense counsel's objections that this was an improper appeal to sympathy were overruled by the trial court and preserved for review. Rather than an appeal to sympathy, this argument addressed the central claim of Appellant's defense, which focused on the victim's prior inconsistent statements regarding the identity of the shooter. The State's response, emphasizing the dire circumstances in which the victim's various statements of identification were given, was entirely proper. *Andrew v. State*, 2007 OK CR 23, ¶ 134, 164 P.3d 176, 203.

¶ 57 Appellant also complains that the prosecutor improperly vouched for the eyewitness Anthony Baltazar. The cited comment drew no objection and we review only for plain error. "Vouching occurs when a prosecutor expresses a personal belief in a witness's credibility, either through explicit assurances or by implying that other evidence, not presented to the jury, supports the witness's testimony." *Browning v. State*, 2006 OK CR 8, ¶ 43, 134 P.3d 816, 841. The prosecutor's statement to the jury in this instance merely pointed out that the eyewitness had consistently identified the Appellant as the shooter. There is no impropriety here. Proposition Five requires no relief.

¶ 58 Proposition Six seeks relief based on cumulative error. The trial court erroneously admitted testimonial hearsay evidence in violation of the Evidence Code and Appellant's constitutional right to confrontation, but considering the remaining evidence, that error is harmless beyond a reasonable doubt. The prosecutor's erroneous comments on the 85% Rule had no substantial influence on the outcome of trial, and are therefore harmless. There are no other substantial errors in this case, and no cumulative effect of errors resulting in unfair prejudice to Appellant. Proposition Six is denied.

6. 21 O.S.2001, § 701.12(2); *Young v. State*, 2000 OK CR 17, ¶ 73, 12 P.3d 20, 42 (aggravating circumstance of causing "great risk of death" shown by shooting attack that killed one victim and injured another).

## DECISION

¶ 59 The Judgment and Sentence of the District Court of Tulsa County is **AFFIRMED.** Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., C. JOHNSON and SMITH, JJ.: concurs.

LUMPKIN, J.: concurs in results.

LUMPKIN, Judge: CONCURRING IN RESULT.

¶ 1 I concur in the result reached in this opinion. However, I write separately to address the following concerns.

¶ 2 This Court's summary opinion in *Johnson v. State*, unpub. dispo., F–2008–1171 (Okl.Cr. January 6, 2010), was not published. As such it is not the rule of law. Rule 3.5(C)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Tit. 22, Ch. 18, App. (2010) ("In all instances, an unpublished decision is not binding on this Court."). While it is the better practice to give a "separate consideration" instruction in trials of multiple offenses, this Court has never required the district court to give such an instruction. *See Smith v. State*, 2007 OK CR 16, ¶ 38, 157 P.3d 1155, 1168–69 (considering effect of instruction to the jury to give separate consideration to each offense in determination of whether the appellant was prejudiced by the joinder of offenses); *Shietze v. State*, 1986 OK CR 131, ¶ 8, 724 P.2d 262, 264 (absence of instruction that jury could not consider evidence of any crimes charged to infer that appellant was guilty of another crime charged found not to constitute fundamental error).

¶ 3 I further note that the Opinion's reference to footnote 6 of *Johnson* illustrates the problem that evolves when footnotes are used to attempt to set out the law. "In law review pieces, all citations appear in footnotes appended to the portions of the text to which they refer." *The Bluebook: A Uniform System of Citation* 45 (Columbia Law Review Ass'n, et al. eds., 18th ed. 2005).

However, in "practitioner's documents" citations are "inserted into the text in one of two ways: as a stand-alone citation sentence or as a citation clause." *Id.*, at 3, 45. In court opinions, the law is generally set forth in the text. *Cannon v. State*, 1995 OK CR 45, ¶ 2, 904 P.2d 89, 108 (Lumpkin, J., concurring in result) ("While there are exceptions, statements in footnotes are generally regarded as dicta, having no precedential value.") *citing Wainwright v. Witt*, 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985) (In determining statements in footnote to be dicta, Court notes it had on other occasions rejected language from a footnote as "not controlling."); *McDaniel v. Sanchez*, 452 U.S. 130, 141–42, 101 S.Ct. 2224, 2232, 68 L.Ed.2d 724 (1981); *Henderson v. Morgan*, 426 U.S. 637, 651, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108 (1976) (White, J., with whom Stewart, Blackmun, and Powell, JJ., join, concurring). The use of footnotes to state the law or attempt to set out the law in this Court's opinions leads to confusion as to what is controlling precedent. Opinions are not law review articles and must be written to give clear and consistent interpretations of the law. This policy ensures the public is given notice of what the law is and trial practitioners of the bench and bar are able to confidently apply it.

¶ 4 In its discussion of *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224, (2006), in Proposition Three, the Opinion states that "[t]he relevant focus is clearly on what is happening to the hearsay declarant when the statements are made, rather than broader concerns of the police or the public at large." This statement is made out of whole cloth, without any supporting authority and in conflict with *Davis*. *Id.* Instead of attempting to come up with new language to describe admissible hearsay we should utilize the United States Supreme Court's description, to wit:

the nature of what was asked and answered in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assail-

ant, so that the dispatched officers might know whether they would be encountering a violent felon.

*Id.,* 547 U.S. at 827, 126 S.Ct. at 2276.

¶ 5 However, it would appear the first question that should be asked in this type of evidentiary issue is whether the Statement even qualifies as "hearsay," *i.e.* was the statement offered for the truth of the matter asserted? If the statement was offered only to show the basis of further action by the police, then it was not hearsay. *See Stouffer v. State,* 2006 OK CR 46, ¶ 76, 147 P.3d 245, 265 (as the information was introduced merely to show why the officer searched for gloves and not for the truth of the matter asserted it constituted nonhearsay); *Powell v. State,* 2000 OK CR 5, ¶ 97, 995 P.2d 510, 532 (2000)(officer's testimony about his communication with the homicide division concerning the case was not hearsay as his statements were not offered for the truth of the matter asserted but to show why officer began to search defendant). The next question would be does this relating of non-hearsay information by the police officer violate the Confrontation Clause of the 6th Amendment? I fail to find where the United States Supreme Court has gone so far as to obviate this long standing rule of evidence. *Andrew v. State,* 2007 OK CR 23, ¶ 31, 164 P.3d 176, 189 ("*Crawford does* not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 1369 n. 9, 158 L.Ed.2d 177 (2004) ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985) (The nonhearsay aspect of the co-defendant's confession—not to prove what happened at the murder scene but to prove what happened when the defendant confessed-raises no Confrontation Clause concerns.).